COMMONWEALTH *vs.* SHAWN DRUMGOLD.

Suffolk. November 6, 1995. - July 18, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Grand Jury. Practice, Criminal,* Grand jury proceedings, Indictment, Dismissal, Conduct of prosecutor, Argument by prosecutor, Instructions to jury, New trial, Assistance of counsel, Capital case. *Constitutional Law,* Fair trial, Burden of proof, Right to obtain testimony, Self-incrimination. *Evidence,* Prior conviction, Joint enterprise. *Joint Enterprise. Due Process of Law,* Burden of proof. *Homicide. Malice. Intent. Jury and Jurors.*

At a murder trial, the judge correctly denied the defendant's motion to dismiss the indictment with prejudice on the ground that the integrity of the grand jury had been impaired by a misleading presentation of evidence, where the defendant did not demonstrate that certain incorrect testimony of a witness or a not entirely correct statement of the prosecutor was knowingly presented to the grand jury in order to obtain an indictment and that the statements probably influenced the grand jury. [235-239]

At a murder trial, the judge correctly denied the defendant's motion to dismiss the indictment due to the prosecutor's failure to present exculpatory evidence to the grand jury where the omission of the evidence did not "greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict" so as to impair the grand jury proceeding. [239-240]

The judge at a murder trial correctly ordered, as sufficient to cure any prejudice to the defendant, the suppression of statements of the defendant obtained through the deliberate and egregious misconduct of the police and the prosecutor's office and properly refused to dismiss the indictment on the same ground. [240-246]

At a murder trial, the judge correctly excused one defense witness who properly invoked his privilege against self-incrimination and correctly refused to allow another defense witness to testify where the witness on voir dire had refused to submit to cross-examination by the Commonwealth. [246-249]

At a murder trial in which the weapon used was a gun the judge did not err in admitting in evidence for impeachment purposes during cross-examination of the defendant the records of several convictions of the defendant for firearms offenses, where the convictions were not so substantially similar to the offense being tried as to be prejudicial. [249-250]

Certain rhetorical remarks of the prosecutor in closing argument at a murder trial were not improper and could not have created a substantial likelihood of a miscarriage of justice. [250-251]

Certain remarks of the prosecutor at a murder trial during the course of his closing argument were improper appeals to the sympathy of the jury but did not create a substantial likelihood of a miscarriage of justice in the circumstances of the case as demonstrated by the evidence. [251-253]

At a murder trial in which one of the two defendants' motions for a required finding of not guilty was allowed at the close of the Commonwealth's case, there was no error in the judge's instructing the jury on joint venture with respect to the remaining defendant where there was evidence that there had been three shooters present when the victim was killed. [253-254]

At a murder trial there was no substantial likelihood of a miscarriage of justice created by the judge's instructions to the jury, which, viewed in context, were not erroneous as to the Commonwealth's burden of proof. [254-257]

At a first degree murder trial, the judge's statement to the jury that the only issue in the case was identification was improper where the defendant had requested and was granted an involuntary manslaughter instruction; however, no substantial likelihood of a miscarriage of justice was created where the jury unanimously concluded on clear instructions from the judge that the defendant had deliberately premeditated the killing. [257-259]

At a murder trial there was no error in the judge's instructions to the jury on transferred intent, on a witness's invocation of his Fifth Amendment rights, or on joint venture. [259]

A defendant convicted of murder in the first degree did not demonstrate that the jury were exposed to a significant extraneous influence as a result of their conversations amongst themselves or from the remarks of a court officer. [259-261]

A criminal defendant did not demonstrate that his trial counsel rendered ineffective assistance in showing a photograph of the defendant to a Commonwealth witness who had previously failed to make a photographic identification of the defendant, where that was not an unreasonable tactical decision [261-263], and there was no merit to the defendant's claim that trial counsel should have withdrawn and testified as a witness at trial with respect to the photograph incident, where counsel's testimony would have added nothing to the defendant's case [263-264].

A criminal defendant did not demonstrate that his counsel rendered ineffective assistance in counsel's decision to have the defendant attend the jury view, which was a reasonable decision, or that counsel was in any other respect ineffective at trial. [264]

No reason appeared on the record of a first degree murder trial to warrant the grant of a new trial or a reduction in the verdict pursuant to the exercise of this court's powers under G. L. c. 278, § 33E. [264-265]

Indictment found and returned in the Superior Court Department on September 7, 1988.

The case was tried before *Charles R. Alberti*, J., and a mo-

tion for a mistrial was heard by him; a motion for a new trial was heard by *Barbara J. Rouse*, J.

*Rosemary Curran Scapicchio* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. A jury found the defendant guilty of murder in the first degree of Darlene Tiffany Moore (victim) with deliberate premeditation. Following the conviction, the defendant moved for a "mistrial," which the judge properly treated as a motion for a new trial. The defendant also filed a separate motion for a new trial which raised additional issues. Both motions were denied. The defendant appeals from his conviction and from the denial of the aforementioned motions. We affirm the conviction and the orders denying the motions.

This appeal presents the following issues: (1) Was the defendant's pretrial motion to dismiss the murder indictment with prejudice on the ground that the integrity of the grand jury had been impaired by a misleading presentation of evidence correctly denied? (2) Was the defendant's pretrial motion to dismiss the indictment with prejudice due to alleged egregious prosecutorial misconduct properly denied? (3) The defendant sought the testimony of a person who refused to testify pursuant to the Fifth Amendment to the United States Constitution. The judge ruled that the proposed witness need not testify. Another person was willing to testify on direct examination by the defendant but, claiming Fifth Amendment protection, expressed unwillingness to submit to cross-examination by the Commonwealth. The judge ruled that that person could not testify on direct examination without being available for cross-examination. The proposed witness did not testify. The correctness of the judge's rulings are in issue. (4) During cross-examination of the defendant, the prosecutor offered, and the judge admitted, evidence of the defendant's prior convictions of unlawful possession of a firearm, defacing the serial number of a firearm, and unlawful possession of ammunition. Although there was no objection at trial, the defendant now challenges the admission of the convictions. (5) In his closing argument to the jury, did the prosecutor improperly express his personal opinion about the defendant's guilt and about the lack of credibility of the codefendant, Terrance Taylor? Did the prosecutor's argument

improperly invite jury sympathy for the victim? (6) At the close of the Commonwealth's case-in-chief, the judge allowed the codefendant Taylor's motion for a required finding of not guilty. Later, in his final instructions to the jury, the judge instructed on joint venture, which the defendant argues was error because it was inconsistent with Taylor's acquittal. (7) Did the judge otherwise commit reversible error in his jury instructions with respect to (a) allocation of the burden of proof, (b) limiting the case to a single issue of identification, as the defendant asserts he did, or (c) the doctrine of transferred intent? Also, did the judge erroneously instruct the jury, as the defendant contends he did, "to consider the acquitted codefendant's claim of Fifth Amendment privilege as substantive evidence in this case?" (8) Did the judge err by denying the defendant's postconviction motion for a mistrial (new trial) after an alternate juror disclosed that, on the eve of arguments and instructions to the jury, she and other jurors conversed among themselves and with the chief court officer about the alternate juror's desire for a mistrial? (9) After obtaining new counsel, the defendant moved for a new trial on the ground that he had been denied effective assistance of counsel, as we shall discuss. We shall consider whether the defendant's motion was properly denied. (10) The final issue is whether relief under G. L. c. 278, § 33E (1994 ed.), is appropriate.

We set forth some of the pertinent evidence introduced at trial as follows. On the evening of August 19, 1988, the victim was sitting on a mailbox near the corner of Humboldt Avenue and Homestead Street in the Roxbury neighborhood of Boston. Chris Chaney was sitting on an adjacent mailbox next to the victim. A crowd of teenagers surrounded the victim and Chaney. Directly behind the mailboxes stood the Boston Edison plant which was enclosed by a chain-link fence. At approximately 9:30 P.M., two or three men wearing black clothing and Halloween masks approached the group from behind, from the direction of the Boston Edison plant, and fired several shots into the crowd. Three bullets struck and killed the victim.

About two weeks before the shooting, Christopher Cousins visited his friend, Romero Holliday, in his hospital room. Holliday was hospitalized due to injuries he had sustained from a gunshot. The defendant and Terrance Taylor (the co-

defendant who was acquitted) were also in Holliday's room. Holliday told the defendant and Taylor that Chris Chaney and Mervin Reese had shot him, and the defendant and Taylor responded that they would "get" Chaney and Reese.

At about 6 P.M. on the evening that the victim was killed, Vantrell McPherson saw the defendant and Taylor about two blocks from the place where the shooting occurred. McPherson testified that the defendant was wearing a black and white Adidas sweatsuit. McPherson heard Taylor say to the defendant, "Come on, Shawn, you know we got to do this."

Later that evening, another witness met the defendant at a different location situated two blocks from the scene of the shooting. The witness testified that Taylor approached them and told the defendant that he knew where they could find Chaney and Reese. The witness further testified that he had seen Taylor and the defendant walk away together and that both men were carrying guns. About forty-five minutes later, according to this witness, Taylor and the defendant returned and, when the witness asked what had happened to the guns, Taylor replied that the guns were "hot" and that he had "stashed" them someplace.

Mary Alexander lived less than one block from the scene of the shooting. When she heard the gunfire she ran outside to bring her son and her neighbor's child into her house. While standing in her doorway, she saw the defendant and another man climb over the Edison plant fence and walk from the scene of the shooting toward Homestead Street. She testified that both men were wearing black or dark blue sweat-shirts and jeans and that the defendant tucked a gun into his waistband.

Tracy Peaks lived upstairs from Alexander. She, too, on hearing gunfire, ran downstairs to bring her sister inside. She saw the defendant, whom she knew, and another man walk past the house. Peaks testified that the defendant was wearing a black turtleneck, black jeans and black shoes.

Six Commonwealth witnesses testified that they had seen the gunmen. Four of those witnesses testified that they had seen only two gunmen. The other two witnesses testified to having seen three gunmen. The six witnesses testified that the gunmen were dressed in black and were wearing Halloween masks. Three of the witnesses testified that one of the gunmen was wearing a black Adidas sweatsuit with a white insignia, and

one testified that both men that he saw were wearing Adidas sweatsuits.

1. *Impairment of grand jury proceedings.* "[A]t the very least the grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him" (citations omitted). *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). In addition, dismissal of an indictment is required when "the defendant has shown that the integrity of the grand jury proceedings was impaired (*Commonwealth* v. *O'Dell*, 392 Mass. 445, 449-450 [1984])." *Commonwealth* v. *Mayfield*, 398 Mass. 615, 620 (1986). However, "it is not enough for dismissal of an indictment that false or deceptive evidence was presented to the grand jury. Two further elements normally must be shown. First, our cases have required a showing that false or deceptive evidence was given to the grand jury knowingly and for the purpose of obtaining an indictment. . . . Second, the defendant must show that the presentation of the false or deceptive evidence probably influenced the grand jury's determination to hand up an indictment. This requires a showing not only that the evidence was material to the question of probable cause but that, on the entire grand jury record, the false or deceptive testimony probably made a difference." *Id.* at 621-622.

Detective Richard Walsh was one of the two grand jury witnesses. He testified that the defendant and the codefendant, Terrance Taylor, had given statements to the police and he summarized, or at least purported to summarize, these statements. The defendant asserts that the summaries did not fairly reflect the statements.

The record shows that the defendant and Taylor told the police that they had spent the evening of the shooting riding around in a black car driven by Paul Duran. Antonio Anthony was with them. They stopped for about one-half hour at Taylor's girl friend's house at 23 Sonoma Street, Roxbury. They drove from there to the scene of the shooting.

The record shows that Taylor stated that Tyron Brewer had stopped Duran's vehicle on Humboldt Avenue and told them about the shooting. Duran drove to the scene where a crowd was standing around the victim. Taylor saw a girl named "Raina" or "Renee," whom he knew. He asked the girl if she knew the victim. When she said, "Yes," he told her to go get the victim's mother. Duran then drove back to 23

Sonoma Street, where he dropped off Taylor, Anthony, and the defendant. These three stayed at 23 Sonoma Street briefly and then walked to a restaurant in the Grove Hall area. From there Taylor took a cab home for the night.

According to the record, the defendant told the police that he and his companions came on the scene of the shooting before they met Brewer. The victim was already lying on the sidewalk surrounded by a crowd. A person was "putting an arm over [the victim's] face." The defendant saw Brewer and asked him if the victim was his (the defendant's) sister Michelle. Brewer answered, "No." Duran then drove to the restaurant in the Grove Hall area. From there the defendant took a cab to his girl friend's house at 218 Humboldt Avenue.

Detective Walsh testified before the grand jury concerning Taylor's and the defendant's statements as follows:

"[Taylor] stated that he was at Shawn Drumgold's house and that [Drumgold] lives right over the Humboldt Superette. And while there, they were talking and eating. A friend named Paul came and picked them up. Paul was the operator of the black Corsica.

"So, it was Terrance Taylor, Shawn Drumgold, the person operating the motor vehicle by the name of Paul and another person by the name of Antoine Anthony left in the black Corsica. [Taylor] stated that they rode around for a while and then they went to 23 Sonoma Street, which is a couple blocks from that area. And he went upstairs and visited his girlfriend for about an hour while the other people stayed downstairs.

"Then they all got back in the motor vehicle and drove around for awhile. When the vehicle arrived back at Humboldt Avenue — he stated to us that it did come back to the Humboldt Avenue area. He stated to me that he observed a crowd and the little girl laying on the street and he learned that the little girl had been shot and that they left the area. They dropped him off and then they went back up to Sonoma Street.

". . . .

"[The defendant Drumgold] informed me that on the evening of [August 19], 1988, he was in the company of Terrance Taylor, Antoine Anthony and a person known to him as Paul, and that they had drove [*sic*] around the area for a while and went to 23 Sonoma Street. They stayed there for a while, about an hour or an hour and a half and then they returned to the Humboldt Avenue area, where he informed me that he observed a crowd around the girl and that she had been shot in the head.

"He also informed me that he never left the motor vehicle and that after that they went to the area of Grove Hall and had something to eat and then went home."

Walsh also testified before the grand jury about the police investigation of the shooting and about the accounts given by several eyewitnesses.

Tracy Peaks was the only other witness before the grand jury. She testified that on August 19, 1988, the date of the shooting, she was living at 72 Homestead Street. She heard gunshots at around 9:30 P.M. Within seconds, she ran downstairs and looked out and "saw two guys walking up the street" from the direction of the Edison plant property which was about one hundred feet from her house. Peaks told the grand jury that "at some time" she was shown a group of photographs and that she selected one of them as being one of the two men she had seen walking by her house, the defendant, Shawn Drumgold, whom she knew "from the neighborhood."

The defendant does not argue that the evidence before the grand jury was insufficient to establish the identity of the accused and probable cause to arrest him. See *Commonwealth v. McCarthy, supra.* Instead, the defendant contends that the integrity of the grand jury proceedings was impaired by false assertions to the grand jury by Walsh and by Walsh's failure to divulge exculpatory evidence of which he was aware.

First, we address the contention that the grand jury proceeding was impaired by false assertions made by Walsh. The defendant points to Walsh's testimony that the defendant had told the police that, when he went to the scene of the shooting, "he observed a crowd around the girl and that the victim had been shot in the head"; whereas, as the record

shows, he only said that he observed the victim on the ground and someone was attending to her. Implicit in the defendant's argument is that Walsh's version of what the defendant had said reveals that the defendant knew much more about what had happened (that the victim had been shot in the head) than did the defendant's actual statement, thereby unfairly suggesting his involvement in the shooting. We accept that Walsh's version of the defendant's statement was incorrect. However, to warrant dismissal of the indictment, the defendant must show that inaccurate or deceptive evidence was given to the grand jury knowingly and in order to obtain an indictment and that the evidence probably influenced the grand jury's determination. *Commonwealth* v. *Mayfield,* 398 Mass. 615 (1986). The record is devoid of such evidence.

The defendant also asserts that another false statement was made to the grand jury that, standing alone or together with other defects in the presentation to the grand jury, requires dismissal of the indictment. During the proceedings a juror asked, "Why don't we have the witnesses in here?" Mr. Beauchesne, the prosecutor, answered, "Well, the short answer to that is I had intended to bring two of the witnesses that I considered to be key witnesses. The other people with regard to the actual shooting don't make an identification. It's really not in debate that there were two shooters and that they were dressed in a particular manner and they fled in a particular way. So I didn't bring everybody in. I brought in what I thought — I tried to bring in what I thought would be enough for probable cause." The prosecutor's statement was not entirely correct. There was disagreement among the witnesses as to whether there were two shooters or three and there was no unanimity with respect to the clothes the shooters were wearing. Nevertheless, the defendant's argument again fails because of lack of proof that Beauchesne intentionally misstated the evidence in order to obtain an indictment and that that evidence probably influenced the grand jury. See *Commonwealth* v. *Mayfield, supra.* To the contrary, the fact that the trial jury subsequently heard conflicting testimony with respect to the clothing worn by the shooters and the number of shooters and yet found beyond a reasonable doubt that the defendant was guilty of murder in the first degree forcefully suggests that the grand jury's decision to indict would not have been different if Beauchesne had not

told them that all the witnesses were in agreement with respect to the number of shooters and the clothing they wore. See *Commonwealth* v. *Trowbridge,* 419 Mass. 750, 754 (1995); *Commonwealth* v. *LaVelle,* 414 Mass. 146, 151 n.2 (1993).

The defendant next contends that the judge erred in not granting his motion for dismissal of the indictment due to the detective's several omissions of exculpatory evidence. A dismissal of an indictment is warranted if prosecutors do not disclose exculpatory evidence which would "greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict," thus resulting in an impairment of the grand jury proceeding. *Commonwealth* v. *McGahee,* 393 Mass. 743, 746 (1985). Prosecutors, however, "are not required in every instance to reveal all exculpatory evidence to a grand jury." *Id.,* citing *Commonwealth* v. *O'Dell,* 392 Mass. 445, 447 (1984).

The defendant points to the statements of nine individuals which, he claims, constituted exculpatory evidence that should have been brought to the attention of the grand jury. We need not discuss each statement separately. Collectively, although the statements varied as to details, they indicated that Theron Davis, known as "Apple," may have been involved in the shooting. Nothing in the statements suggested that the defendant was not also involved. The omission of this evidence before the grand jury did not "greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict" (*McGahee, supra*) and thus did not impair the integrity of the grand jury proceeding. The fact that Apple may have been one of several shooters did not undermine the Commonwealth's theory that the defendant was one of two or three of them.

Finally, relying on *Commonwealth* v. *O'Dell,* 392 Mass. 445 (1984), the defendant argues for the first time on appeal that "the prosecutor selectively presented limited inculpatory portions of Taylor and Drumgold's in-custody statements and failed to include the portions of Taylor's statement which named the other suspected perpetrator ['Apple'] and explained the drug-related feud between the Humboldt and Castlegate Street gangs." In addition, the defendant argues that "[t]he prosector failed to reveal to the Grand Jury that Drumgold explicitly denied that he possessed a firearm and that Drumgold explained his being out of the car at the scene."

The defendant's reliance on *O'Dell* is misplaced. In that case, we reasoned that a detective's presentation to the grand jury of an edited statement of the defendant was not "a mere withholding of exculpatory evidence. Rather, presentation of the defendant's edited statement tended to distort the meaning of that portion of the defendant's statement that was repeated to the grand jury and, in addition, strongly suggested, incorrectly, an admission of guilt by silence." *Id.* at 449. In the present case, however, Walsh's presentation of an edited version of the defendant's statement had no tendency to convert the defendant's exculpatory statement into an inculpatory one. Unlike in *O'Dell*, the meaning of the portion of the defendant's statement that was recounted to the grand jury was not distorted by the omissions. Thus, the omissions did not "greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict." *Commonwealth v. McGahee, supra* at 746.

What we have said with respect to Walsh's presentation to the grand jury of the defendant's police statement applies with equal force to Walsh's presentation of Taylor's statement. The fair meaning of the recounted portions of Taylor's police statement was not distorted by Walsh's failure to recount other portions. The judge did not err in refusing to dismiss the indictment on the ground that the grand jury proceedings were impaired.

2. *Egregious prosecutorial misconduct.* Before trial, the defendant moved for suppression of the statements he had made to the police and for dismissal of the indictment against him due to prosecutorial misconduct relating thereto. The judge allowed the motion to suppress but denied the motion to dismiss. We summarize the judge's findings as follows:

"At approximately 9:15 A.M. on August 29, 1988, Detectives Walsh and Murphy arrived at Assistant District Attorney John Canavan's office in the Roxbury District Court for the purpose of obtaining approval for a complaint against Drumgold for the murder of Darlene Tiffany Moore. Canavan informed the Detectives that Drumgold . . . was already in custody at the Roxbury courthouse on drug charges.

"   . . .

"At Drumgold's initial appearance around 9:30 A.M., the court appointed Attorney Paul Hadley to represent him on the drug charges. Hadley and Canavan approached the bench and Canavan informed Judge Martin that Drumgold was to be charged with murder, and that the police wished to take him to Area B for booking.

"I infer that this matter was passed pending the arrival of Drumgold's appointed attorney, Steven J. Rappaport. . . . At approximate 11:00 A.M., the Committee [for Public Counsel Services] contacted Attorney Steven J. Rappaport's office requesting that he represent Drumgold. Rappaport agreed to represent Drumgold, and told the committee that they should inform Judge Martin that he would appear for Drumgold as soon as he could get to court. At 12:10 P.M., the Committee contacted the court to confirm Mr. Rappaport's appointment.

"Sometime early in the court's day after Drumgold's arraignment on the drug charge, Ms. Leslie Walker, a staff attorney for the Roxbury Defenders Unit of the Committee for Public Counsel Services, became aware that Drumgold had been or was about to be charged with murder. . . . Walker . . . informed [Drumgold] that he was to be charged with a serious offense, and that he should not speak to anyone until his court appointed attorney arrived. Drumgold told her that he understood.

"Thereafter at approximately 10:00 A.M. . . . [Detective] Walsh informed Drumgold that he had obtained a complaint against him for the murder of Tiffany Moore. Walsh asked Drumgold if he wanted to make a statement. Drumgold responded, 'Ms. Leslie Walker told me I didn't have to talk to nobody.' Drumgold asked if a lawyer had been appointed to represent him, and the officers responded 'no, not at the moment.' Walsh informed Drumgold that he would be back later to book him on the murder charge. . . .

". . .

"At approximately 12:00 P.M., Judge Martin was asked to go to the sidebar to discuss the Drumgold matter. Deputy Superintendent William Celester, the Commanding Officer of Area B, Canavan, Detective Murphy, and Attorney Paul Hadley, were present at the conference."

The motion judge then states in his memorandum that although the "testimony regarding the content of this crucial side bar conference [was] divergent," he "specifically [found] that Judge Martin's testimony [was] credible and [was] fully supported by the evidence." He concluded that "the Judge's version [was] the truth." Judge Martin's testimony as set forth in the memorandum was that at the side bar conference he directed the police not to interrogate Drumgold and that he was releasing him to their custody only for photographing and fingerprinting.

The motion judge's memorandum continues:

"I infer that sometime relatively soon after the 12:00 P.M. bench conference, Drumgold was transported to the Area B Police Station, ostensibly for the purpose of additional photographing and fingerprinting. He inquired as to why he was being removed, and the police told him that he was going to be booked and questioned. In response, Drumgold said, 'For what? There is supposed to be a lawyer representing me.' Drumgold asked whether a lawyer had been appointed to him and Walsh responded that there was no one to represent him.

"At Area B, Drumgold was brought to a room on the second floor. The officers played a tape of Taylor's statement, and indicated that one individual told them 'he heard that [Drumgold] was the one that shot the little girl', and another said that Drumgold had been seen at a picnic with two pistols. At 1:30 P.M., Drumgold signed a written waiver of rights form. The police tape recorded Drumgold's oral waiver of his rights and his statement concerning the shooting of Darlene Tiffany Moore.

"Attorney Rappaport arrived at the Roxbury Division at approximately 1:15 P.M. where he spoke with Attorney Leslie Walker of the Roxbury Office of the Com-

mittee. She informed Rappaport that she had represented Drumgold in the past and that when she learned Drumgold had been served with a murder warrant, she advised Drumgold not to speak with the police until his attorney arrived to represent him. Rappaport went to the First Session Court Room where he learned that his client had been taken from the building by Boston police officers for fingerprinting and photographing.

"Hadley told Rappaport that Judge Martin had permitted the police to take Drumgold out of the court for the purpose of fingerprinting and photographing. Hadley went on to tell Rappaport that Judge Martin had ordered the police and Assistant District Attorney Canavan not to interrogate Drumgold until his attorney arrived at the court to consult with him. Hadley also told Rappaport that he had advised Drumgold not to make any statements to the police until his appointed attorney for the murder complaint arrived.

"At approximately 2:05 P.M., Rappaport went to the Area B Police Station to see if he could find his client. The station is located 200 yards from the courthouse. He identified himself to a detective as Drumgold's attorney and requested to speak with Drumgold. The detective confirmed that Drumgold was at the station and asked Rappaport to wait a few minutes. Rappaport then spoke to Drumgold's family who told Rappaport that police officers had just taken Drumgold out of the station through a secondary door.

"At approximately 2:15 P.M., Rappaport observed Detectives Walsh and Murphy of the Homicide Unit leaving the station. He asked them if they had been assigned to the Tiffany Moore murder case. When they responded in the affirmative, Rappaport told them that he did not want either of them to interrogate Drumgold. They told him that they had already tape recorded Drumgold's statement. When Rappaport asked to see his client, the officers informed him that Drumgold was being brought downtown to the identification section for photographing and fingerprinting.

"Rappaport returned to the Roxbury Division and at approximate 2:45 P.M., he spoke to Judge Martin and reported that Detectives Walsh and Murphy had tape recorded a statement from his client. Judge Martin told Rappaport that he had permitted the police to remove Drumgold from the court house on their representation that he would not be interrogated."

Although the judge suppressed the defendant's statements to the police, he denied the defendant's motion to dismiss the indictment. We set forth the principal thrust of the judge's reasoning:

"Based on all the credible evidence presented at the suppression hearing, I find that the pattern of conduct engaged in by the police and the district attorney's office from the outset was designed to compromise Drumgold's rights. . . . In so doing, these two agencies engaged in an intentional deceit upon a judge of the District Court Department who was attempting under the most trying of circumstances to protect Drumgold's constitutional rights. Drumgold was removed from the courthouse under false pretenses and questioned at Area B in direct contravention of Judge Martin's order. I find that this type of conduct is deplorable and cannot be countenanced.

". . .

"I do not agree with Drumgold's contention that, as a result of Drumgold's statement, the prosecution obtained an improper advantage in anticipating defense trial strategy thereby causing irremediable prejudice to the defense. See [*Commonwealth* v. *Fontaine*, 401 Mass. 491, 497 (1988)]. However, I find that Drumgold would be prejudiced by the Commonwealth's use at trial of the improperly obtained statement. Therefore, independent of my decision to suppress Drumgold's statements made at the Area B station on Fifth Amendment grounds, I find that prosecutorial misconduct in questioning Drumgold in violation of Judge Martin's order warrants suppression of the statement. I find that the remedy of

suppression is sufficient to cure any prejudice occasioned by the deliberate misconduct of the authorities; therefore, dismissal of the indictment is unwarranted. See Commonwealth v. Carlson, 17 Mass. App. Ct. 52, 60 n.6 (1983) (['A] claim of prejudice will usually fail if the taint caused by the misconduct can be identified and neutralized by relief appropriate in the circumstances, such as suppression of the evidence obtained as a result of the misconduct')."

We are satisfied that the judge was correct in predicting that suppression of the defendant's statements to the police at the Area B station would be "sufficient to cure any prejudice occasioned by the deliberate [and egregious] misconduct of the authorities." The defendant argues, however, that the police misconduct irremediably prejudiced him because it gave the Commonwealth an "improper advantage in anticipating defense trial strategy and in preparing for cross-examination of the defendant." Commonwealth v. Fontaine, 402 Mass. 491, 497 (1988). Specifically, the defendant says that, "[b]ut for the Boston Police conduct in taking illegal statements from both Drumgold and codefendant Taylor, they would never have learned the identity of [alibi witnesses] Antonio Anthony or Paul Duran. They would not have known enough to question and call, as a rebuttal witness, Rene Roisten as to what time Drumgold came home on the night Tiffany Moore was shot. . . . The police would not have had enough evidence to get a search warrant or to seize Taylor's black Adidas jacket."

The defendant's argument is not persuasive because, if the Commonwealth had not learned the identity of Anthony and Duran and essentially what their testimony was likely to be from the defendant's and Taylor's statements, there is no reason to believe that the Commonwealth would not have obtained that information pursuant to Mass. R. Crim. P. 14 (b) (1) (A), 378 Mass. 874 (1979). That rule provides in pertinent part as follows:

"(A) NOTICE BY DEFENDANT. The judge may, upon written motion of the Commonwealth . . . order that the defendant serve upon the prosecutor a written notice, signed by the defendant, of his intention to offer a

defense of alibi. The notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish the alibi."

Lastly, we reject the contention that, without the wrongly obtained statements, the police would not have been sufficiently informed to obtain a warrant to search for and seize the defendant's black Adidas jacket for forensic testing. The defendant's contention is refuted by the existence of numerous eyewitnesses who observed at least one of Moore's assailants to be wearing a black Adidas sweatsuit. With the ill-gotten statements suppressed, the police misconduct did not prejudice the defendant.

"[W]e have never ordered the dismissal of an indictment for misconduct in the absence of prejudice." *Commonwealth* v. *Phillips,* 413 Mass. 50, 59 (1992), quoting *Commonwealth* v. *King,* 400 Mass. 283, 290 (1987). See *Commonwealth* v. *Lewin,* 405 Mass. 566, 586 (1989). "Whether an indictment should be dismissed upon the defendant's motion where the prosecution has acted improperly, turns primarily on the ability of the defendant to obtain a fair trial after, and in light of, the impropriety." *Commonwealth* v. *King, supra* at 291, quoting *Commonwealth* v. *Lam Hue To,* 391 Mass. 301, 312-313 (1984). "[T]he public has a substantial interest in prosecuting those accused of crime and bringing the guilty to justice." *Commonwealth* v. *King, supra* at 290. "The only reason to dismiss criminal charges because of nonprejudicial but egregious police misconduct would be to create a climate adverse to repetition of that misconduct that would not otherwise exist." *Commonwealth* v. *Lewin, supra* at 587. "Nothing in the record suggests, nor is there good reason to suppose, that, unless this court provides a prophylactic remedy, police officers are likely to repeat the type of conduct that occurred in this case. In the absence of a demonstrated need for deterrence, a prophylactic remedy is inappropriate." *Commonwealth* v. *King, supra* at 292. Therefore, we conclude that the judge correctly denied the defendant's motion to dismiss the indictment on account of prosecutorial misconduct.

3. *Trial judge's refusal to order witness to testify; trial judge's*

*refusal to permit other witness to testify.* The Commonwealth introduced evidence that would have warranted the conclusion that the shooting of Tiffany Moore was motivated by the defendant's desire to retaliate against Chris Chaney and Mervin Reese for the prior shooting of Romero Holliday. The Commonwealth proceeded on a theory of transferred intent, arguing to the jury that the victim was merely an innocent bystander who happened to have been sitting next to Chaney at the time of the shooting, which was meant for Chaney. To contradict the prosecution's theory, defense counsel stated his intention to call Chaney and Reese to testify before the jury. Counsel's plan was that Chaney and Reese would testify that there was no animosity between the defendant and themselves. In addition, the witnesses would corroborate the defendant's alibi. During voir dire, Chaney asserted his right under the Fifth Amendment not to testify. He refused to submit to direct examination by defense counsel. Reese, on the other hand, at a separate voir dire, testified on direct examination, but invoked his Fifth Amendment right to remain silent with respect to all questions put to him on cross-examination. The judge excused Chaney and Reese. Neither of them testified before the jury. The defendant argues that the judge's rulings violated his right to present a defense, secured under art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution applicable to the State through the due process clause of the Fourteenth Amendment. There was no error.

The Sixth Amendment guarantees a defendant's right to present a defense, including the right to call witnesses to testify on his behalf. *Washington* v. *Texas*, 388 U.S. 14, 19 (1967). *Commonwealth* v. *Durning*, 406 Mass. 485, 495 (1990). Accord *Taylor* v. *Illinois*, 484 U.S. 400, 408-409 (1987). "However, the right to call witnesses is not absolute; in the face of 'legitimate demands of the adversarial system,' this right may be tempered according to the discretion of the trial judge." *Commonwealth* v. *Durning, supra* at 495, quoting *United States* v. *Nobles*, 422 U.S. 225, 241 (1975). If a judge exercises his or her discretion to limit the defendant's right to call witnesses, the restriction cannot be arbitrary. See *Washington* v. *Texas, supra* at 23. In this case, the judge's decision to excuse Chaney and Reese was not arbitrary.

One of the limitations on a defendant's right to call a wit-

ness includes the witness's proper invocation of the Fifth Amendment privilege against self-incrimination. *Commonwealth* v. *Francis*, 375 Mass. 211, 214-215, cert. denied, 439 U.S. 872 (1978). Chaney asserted that, if he were to testify, he might implicate himself as a member of the Humboldt gang, which at that time was under criminal investigation. Nothing in the record or in the defendant's brief suggests that the judge erred in concluding that Chaney had properly invoked his privilege against self-incrimination. The defendant, therefore, had no right to his testimony to the jury.

The defendant also had no right to Reese's jury testimony including the testimony he readily had given in voir dire that he did not have "any difficulties between [himself] and Shawn Drumgold." At the voir dire Reese refused to submit to cross-examination, invoking the Fifth Amendment. The questions that he refused to answer related specifically to his direct testimony. By cross-examination, the Commonwealth sought to refute Reese's assertion concerning lack of "difficulties" between the defendant and himself by inquiring as to Reese's involvement with the shooting of Romero Holliday. Such an examination clearly threatened to evoke incriminatory answers. The theory of the Commonwealth's case was that the defendant was hostile to Chaney and Reese because, as a result of Holliday's disclosures, the defendant believed that Holliday had been shot by them. Reese's direct testimony on voir dire, then, went directly to the heart of the Commonwealth's case. A repetition of the voir dire scenario obviously would have been unfair and contrary to the "legitimate demands of the adversarial system," and the judge correctly prevented it. "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *United States* v. *Nobles*, 422 U.S. 225, 241 (1975). "Reaching the truth is a fundamental goal of trials, and cross-examination is critical to the process." *United States* v. *Esparsen*, 930 F.2d 1461, 1469 (10th Cir. 1991), cert. denied, 502 U.S. 1036 (1992). It follows that although a defendant has a right to present witnesses in his defense, that right "does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination."

*Lawson* v. *Murray*, 837 F.2d 653, 655 (4th Cir.), cert. denied, 488 U.S. 831 (1988).

4. *Admission in evidence of the defendant's prior convictions.* During cross-examination of the defendant, and without objection, the Commonwealth introduced in evidence the records of several convictions of the defendant, including convictions of unlawful possession of a firearm, defacing a firearm, and unlawful possession of ammunition. Despite the lack of objection at trial, the defendant argues on appeal that the latter three records of conviction were erroneously admitted and "unduly prejudiced" him. In the absence of trial objections, we ordinarily would review the admission of convictions only if error in that regard would pose a substantial risk of a miscarriage of justice, a situation which does not obtain here. Nevertheless, we shall somewhat briefly speak to the issue because, as we shall discuss later in this opinion, the defendant argues that his trial counsel provided ineffective assistance in many particulars, including his failure to object to the introduction of the aforementioned records of conviction.

The judge did not err in admitting the challenged evidence. "The use of evidence of prior criminal convictions to impeach the credibility of a witness, including the defendant, is specifically authorized by G. L. c. 233, § 21, and does not infringe on the Federal or State constitutional rights of a defendant. . . . The decision whether to admit evidence of prior convictions to impeach a witness involves an exercise of discretion by the judge. *Commonwealth* v. *Knight*, 392 Mass. 192, 194 (1984). The judge must balance the danger of unfair prejudice which can result from the admission of evidence of prior convictions against the probative value of the evidence for the purpose of impeachment. *Commonwealth* v. *Maguire*, 392 Mass. 466, 470 (1984). . . . 'The rationale for impeachment by prior conviction lies in the fact that the defendant's past conduct may have a tendency to demonstrate present untruthfulness; that is, a defendant's earlier disregard for the law may suggest to the fact finder similar disregard for the courtroom oath.' *Commonwealth* v. *Roucoulet*, 22 Mass. App. Ct. 603, 608 (1986). See *Commonwealth* v. *Elliot*, 393 Mass. 824, 834 (1985) (Lynch, J., concurring). Nevertheless, we have recognized a danger that unfair and improper inferences may be drawn by the fact finder if a prior conviction is *substantially similar* to the crime being tried. *Maguire, supra*

at 471. [*Commonwealth*] v. *Diaz*, [383 Mass. 73, 78 (1981)]."
(Footnotes omitted; emphasis added.) *Commonwealth* v. *Fano*,
400 Mass. 296, 301-303 (1987). Generally, a prior conviction
must be substantially similar to the charged offense for the
prejudicial effect to outweigh the probative value of prior
conviction evidence. As the Appeals Court has said, "It is at
least difficult, if not impossible, to show an abuse of discre-
tion in the absence of a 'substantial similarity' between the of-
fenses being tried and the prior convictions." *Commonwealth*
v. *Preston*, 27 Mass. App. Ct. 16, 23 (1989). We conclude
that the judge did not abuse his discretion in this case, involv-
ing a murder indictment, by admitting in evidence with suit-
able jury instructions the defendant's less than substantially
similar convictions of unlawful possession of a firearm, defac-
ing a firearm, and unlawful possession of ammunition.

5. *The prosecutor's closing argument.* The defendant argues
on appeal for the first time that, in his summation to the jury,
the prosecutor improperly expressed his personal opinion that
the defendant was one of the shooters when he said, while
pointing at the defendant, "I am convinced beyond a reason-
able doubt that this is the guy who had a white mask on."
The defendant also argues that the prosecution improperly
expressed his own opinion of codefendant Taylor's credibility
as a witness when he told the jury, "I wouldn't believe Taylor
if he told me my coat was on fire."

To be understood correctly, the prosecutor's remarks must
be seen in context. The prosecutor stated in relevant part the
following:

> "Does it now begin to add up? Do you begin to say
> that granted the Commonwealth does not have a video-
> tape like I'd be shown in a popular T.V. series, but
> there's just too much here for me to say I'm not
> convinced. I am convinced beyond a reasonable doubt
> that this is the guy who had a white mask on. This is
> the guy that was putting his gun away as the gunshots
> still echoed, a smoking gun, if you will. Do you say that
> is enough? . . . [W]hen you get through, at some point
> you will say, I don't believe [the defendant's] alibi. I
> wouldn't believe that Taylor if he told me my coat was
> on fire."

Clearly, the prosecutor was rhetorically urging each juror

separately to conclude that the evidence of guilt was so strong that he or she, the juror, should be "convinced beyond a reasonable doubt that [the defendant] is the guy who had a white mask on" and that Taylor's testimony in support of the defendant's alibi was unbelievable. No reasonable juror could have understood the prosecutor to be personally vouching for the defendant's guilt or Taylor's lack of credibility. In our view there was no impropriety. Surely, the aforementioned remarks unobjected to at trial, whether viewed alone or in conjunction with the prosecutor's remarks discussed immediately below, did not create a substantial likelihood of a miscarriage of justice.

In addition, the defendant argues that the prosecutor unlawfully preyed on the sympathy of the jury in his inflammatory emotional appeal during his closing argument. The prosecutor said to the jury:

"You are the judges in this case. . . . [The judge] does not pass on the guilt or innocence of this man, Mr. Drumgold. You are the people who will apply your good common sense, all of the information that you've heard over the last week and a half and the law that the Court tells you applies to the facts.

"But when all is said and done, when the twelve of you are up in that room, it's up to you, according to your oath, to do justice in this case, not based on sympathy for some person who is accused here because he's clearly a sympathetic person. All of society — all of the might of society has gathered to convict Shawn Drumgold.

"Well, you might say, well, that's terrible, you know, they're picking on him. *But think of the person who isn't here, not from the standpoint of sympathy but from simple justice. Tiffany Moore is as much entitled to clear, cool, calm justice as is Shawn Drumgold.* So according to your oaths you come now to a fork in the road and you're not going to be allowed to walk away from it. In a very short time you people, twelve of you, are going to have to decide what is the truth according to the facts of [*sic*] the law and what is justice. And you will find that it will

be a hard and emotional and tiring experience. But you've taken on that responsibility and you have a very solemn duty to do the very best that you can. Not with sympathy or prejudice but with logic.

" . . .

"Now, you heard the term 'common sense' used. It's that degree of intelligence and ability that you all use every day. *And that's what you're going to use to decide this dispute between Tiffany Moore and Shawn Drumgold,* common sense.

"There are some other things that you may not have thought about, and again I say the judge gives you the law, but in my discussion I'm going to refer to inference, not guesswork, but something you people do everyday and probably never thought about it. You say, well, now, . . . what are you talking about, an inference? You don't want me to guess at this man's guilt. And the answer is no.

"An inference is not a guess. An inference is based upon fact. What's he talking about? An example: in the old days when milk was delivered to your house you got milk, cold, fresh milk. At night, for example, you'd put the bottles out, it snows in the night, and in the morning you get up there are a couple of tracks coming down the street, footprints to your door, empty bottles gone, fresh bottles there, footprints leaving, milk truck not there, just another set of tracks. You say to your wife or your husband, the milkman came and you use the milk. You never saw the milkman. It's a reasonable inference based upon the facts, tracks, empties gone, fresh there, that the milkman came. That is not a guess. That is a reasonable inference. It's that type of decision-making that I ask you to apply to the facts in this case very cooly, very calmly, *without thinking about the results to either party, Tiffany Moore or Shawn Drumgold. . . . [Shawn Drumgold's] entitled to the truth and Tiffany Moore is entitled to the truth just as much as he is."*

In arguing that "the prosecutor unlawfully preyed upon

the sympathy of the jury," the defendant focuses primarily on the statements we have emphasized. The defendant argues that, by "ask[ing] the jury to think about the dead eleven year old girl and find justice for her," the prosecutor was attempting "to sweep [the] jurors beyond a fair and calm consideration of the evidence." *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926).

It was improper for the prosecutor to characterize the case as a dispute between Tiffany Moore, the deceased innocent victim, and Shawn Drumgold, the defendant, and to advise the jury that Moore, as well as the defendant, was entitled to justice. Of course, both parties to this case were and are entitled to justice, but the Commonwealth and the defendant are the parties. Moore was not, and is not, a party. For the prosecutor to encourage the jury to view the case as a dispute between the innocent victim and her alleged killer was unfairly to invite the jury to be influenced in arriving at their verdict by sympathy for the victim. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 830-831 (1996). This is so despite the prosecutor's contrary admonition that neither "party," neither Moore nor Drumgold, was more entitled to justice than the other and that the jury should not be influenced by sympathy. Nevertheless, we think it is unlikely that the defendant was prejudiced by the prosecutor's challenged remarks. There is little reason to think that the remarks added to the sympathetic appeal of the tragedy of the victim's death as was disclosed by the evidence. A fortiori, the remarks did not create a substantial likelihood of a miscarriage of justice to the defendant, which is the appropriate test where, as here, there was no objection at trial.

6. *Jury instruction about joint venture.* At the close of the Commonwealth's case against the defendant and the codefendant, Taylor, both defendants moved for required findings of not guilty. The judge denied the defendant's motion but allowed Taylor's. After the close of all the evidence, in the course of final jury instructions, the judge instructed on a joint venture theory of guilt. For the first time on appeal, the defendant argues that that instruction should not have been given because it was inconsistent with the required finding that Taylor was not guilty.

The instruction was appropriate. There was evidence that there were two shooters and there was other evidence that

there were three shooters. The acquittal of Taylor did not es-
tablish that the defendant was not a joint venturer with one
or two unidentified coventurers. A defendant may be
convicted of murder based on a joint venture theory without
proof of the identity of the other joint venturer or joint ventur-
ers. *Commonwealth* v. *Cohen*, 412 Mass. 375, 380-381 (1992).
*Commonwealth* v. *Dyer*, 389 Mass. 677, 682-683 (1983). *Com-
monwealth* v. *Sullivan*, 354 Mass. 598, 608 (1968), cert.
denied, 393 U.S. 1056 (1969). A joint venturer is "one who
aids, commands, counsels, or encourages commission of a
crime while sharing with the principal the mental state
required for the crime." *Commonwealth* v. *Stewart*, 411 Mass.
345, 350 (1991), quoting *Commonwealth* v. *Soares*, 377 Mass.
461, 470, cert. denied, 444 U.S. 881 (1979). Here, the required
mental state is deliberately premeditated malice aforethought.
*Commonwealth* v. *Smith*, 413 Mass. 275, 279 (1992). Regard-
less of whether the defendant or a companion, not necessarily
Taylor, shot Moore, the evidence was sufficient to warrant a
finding that the defendant was guilty of murder with deliber-
ate premeditation as a joint venturer. See *Commonwealth* v.
*Dyer, supra* at 683.

7. *Other jury instructions.* Because the defendant did not
object at trial, we shall consider whether the instructions that
he now challenges were erroneous and, if so, whether reversal
is required because of "a substantial likelihood of a miscar-
riage of justice." *Commonwealth* v. *Torres*, 420 Mass. 479,
483 (1995). *Commonwealth* v. *Keevan*, 400 Mass. 557, 564
(1987). The defendant assigns as error portions of the instruc-
tions that he contends impermissibly shifted the burden of
proof from the Commonwealth to him, thereby depriving him
of due process. The first of these, which occurred following
the jury's taking of a view, was as follows:

> (1) "Every fact you find, whether it's a subsidiary fact,
> or a small point, or the ultimate fact of innocence or
> guilt, because that's your ultimate responsibility as to
> each of them, must be found beyond a reasonable doubt
> to the satisfaction of what will be the unanimous verdict
> of this jury, unanimous."

The remainder occurred during the judge's final instruc-
tions to the jury:

(2) "There will be four choices: not guilty, guilty of murder in the first degree, guilty of murder in the second degree, guilty of involuntary manslaughter. Now there will be only one verdict possible. As you will hear in a few moments, it must be a unanimous verdict proven beyond a reasonable doubt."

(3) "I told you in the beginning that this is a determination whether the evidence presented establishes beyond a reasonable doubt the guilt or innocence of this defendant."

(4) "There are two things to keep in mind about circumstantial evidence. The first one is that you may draw inferences and conclusions only from facts which have been proved to you beyond a reasonable doubt."

(5) "You decide how much or little to be believed with the full understanding that everything must be proven beyond a reasonable doubt to the satisfaction of your unanimous group. I'm sure you're going to dream about that phrase from now on, but that's what the law requires."

(6) "You're going to have to decide what evidence you believe and what evidence you don't believe."

(7) "Alibi. You've heard evidence in this case suggesting that the defendant was at another place at the time which this offense was committed. You'll have to decide whether or not you believe that evidence. Obviously, if you believe it, then, the Commonwealth has failed to prove beyond a reasonable doubt and you must find the defendant not guilty."

"The due process clause of the Fourteenth Amendment to the United States Constitution 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *Francis* v. *Franklin*, 471 U.S. 307, 313 (1985), quoting *In re Winship*, 397 U.S. 358, 364 (1970). This fundamental principle prohibits a judge from using 'evidentiary presump-

tions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.' *Francis* v. *Franklin, supra.* See *Sandstrom* v. *Montana,* 442 U.S. 510, 520-524 (1979); *Commonwealth* v. *Lykus,* 406 Mass. 135, 143 (1989). In order to determine whether a jury instruction fails to meet constitutional muster, a reviewing court first must focus on the specific language challenged. *California* v. *Brown,* 479 U.S. 538, 541 (1987), citing *Francis* v. *Franklin, supra* at 315. If that language, considered in isolation, 'could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense,' *Francis* v. *Franklin, supra,* then the reviewing court must examine the charge as a whole to see if the entire charge delivered a correct interpretation of the law." *Commonwealth* v. *Torres, supra* at 489. See *Commonwealth* v. *Repoza,* 400 Mass. 516, 519, cert. denied, 484 U.S. 935 (1987) ("jury instructions are not to be viewed in isolation but rather in the context of the charge as a whole"); *Commonwealth* v. *Cundriff,* 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981) ("Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context").

Several of these segments of the jury instructions were less than ideally worded in that, in isolation, they implied that a verdict of not guilty required proof beyond a reasonable doubt. However, read in the context of the judge's entire instructions, those fragmented statements could not reasonably have resulted in the jury's failure to understand that the Commonwealth had the burden of proving every essential element of the crime charged and the defendant had no burden of proof. In his final instructions, the judge began with a detailed instruction concerning the presumption of the defendant's innocence. He told the jury:

"The law presumes the defendant to be innocent of the charge against him. This presumption of innocence is a rule of law that compels you to find the defendant not guilty unless the Commonwealth proves evidence from whatever source that proves that the defendant is guilty beyond a reasonable doubt to your unanimous group. The burden of proof never shifts. The defendant

is not required to call any witnesses or produce any evidence since he is presumed to be innocent.

"Presumption of innocence stays with the defendant unless and until the evidence convinces you unanimously as a jury that the defendant is guilty beyond a reasonable doubt. It requires you to find the defendant not guilty unless his guilt has been proven beyond a reasonable doubt."

During his instruction concerning the elements of murder and manslaughter, the judge five times said that the Commonwealth was required to prove each element beyond a reasonable doubt. When addressing the issue of alibi, he instructed that "if you have a reasonable doubt whether the defendant was present at the time and place of the offense or about any other element of the crime, you must find him not guilty." In addition, following the instructions numbered above, the judge repeatedly said that if, after consideration of "all of the evidence you find the Commonwealth has not proven any one of those three elements beyond a reasonable doubt, you must find the defendant not guilty." We conclude that the judge's instructions as to burden of proof, viewed in context, did not constitute error and that, in any event, they did not result in a substantial risk of a miscarriage of justice.

The defendant next assigns as error the judge's statements that, "It's not an issue there was a murder. It's not an issue there was a tragic event and a young child was killed by bullets, murdered. The issue in this case is identification." The defendant asserts that the judge's statements "narrowed the case against Drumgold to the single issue of identification despite contradictory instructions on the offense of involuntary manslaughter." The defendant contends that these statements "invaded the province of the jury by inviting sympathy for the victim and conclusively directing a verdict of guilty on all essential elements of the offense of murder."

We note that defense counsel, in his opening statement, stated, "The first phase of the case began on the night of Tiffany Moore's *murder*. I make no bones about it, ladies and gentlemen, *it was a murder*." Nonetheless, he requested, and was granted, an involuntary manslaughter instruction. Thus, although the defendant at the beginning of trial conceded

that the victim had been murdered, at the end of trial it was evident that the defendant no longer maintained that position. It is well settled that "[w]here a dispute as to . . . facts exists . . . an accused [has] the right to have a jury decide the question. A judge may not 'invade the province of the jury by undertaking to decide on the weight or effect of evidence, or by refusing to submit to their consideration any question of fact, material to the issue, which may be in dispute.' *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 370 (1977), quoting *Gavett* v. *Manchester & Lawrence R.R.*, 16 Gray 501, 505 (1860)." *Commonwealth* v. *McDuffee*, 379 Mass. 353, 363-364 (1979). Accordingly, we agree with the defendant that the trial judge's statement was improper. See *Commonwealth* v. *McDuffee, supra* at 363.

Because the defendant did not object to the judge's misstatement at trial, however, we shall reverse the conviction only upon a finding of a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Gallison*, 384 Mass. 184, 193 (1981). *Commonwealth* v. *Williams*, 378 Mass. 217, 237-238 (1979). The jury returned a verdict of murder in the first degree by means of deliberate premeditation. The judge's misstatements were silent about whether the murder was deliberately premeditated. To the contrary, the judge specifically instructed the jury twice that "[i]n order to prove murder in the second degree as distinguished from murder in the first degree, the Commonwealth is not required to prove deliberate premeditation." Furthermore, he emphatically stated that the jury were required to acquit the defendant of murder in the first degree if the Commonwealth failed to prove deliberate premeditation beyond a reasonable doubt. The jurors, however, found that the defendant had deliberately premeditated the killing. Thus, they necessarily also found that the defendant had committed an unlawful killing with malice aforethought. *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985). Even assuming that the jury were "directed" to a finding of malice, thus precluding a verdict of voluntary manslaughter, the jury, as their verdict evidences, surpassed the malice threshold when they unanimously concluded that the defendant had deliberately premeditated the killing. *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995) (deliberate premeditation requires defendant to "act with the intent that his actions will cause death and that he acted with sufficient

time [even if fleeting] to reflect on that consequence" [footnote omitted]). *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994) ("To prove that a defendant committed murder with deliberate premeditation, the Commonwealth must prove that the defendant resolved to kill after a period of reflection"). Therefore, the judge's incorrect statements were not prejudicial to the defendant.

The defendant's final challenges to three portions of the jury instructions are without merit. First, he assigns as error the instruction concerning transferred intent. The instruction was as follows:

> "If a person intends to harm someone and goes about harming that person but instead of harming the person in question — let's call him Smith — and harms Jones, the law considers that the person started out to harm Jones. That's all that the transferred intent means. If I aim at one person but hit another person the law assumes that I intended to hit the second person. That's what transferred intent means."

The instruction did not impermissibly instruct the jury, as the defendant contends it did, that there was a conclusive presumption of transferred intent from the mere aiming of a firearm. Rather, the instruction included a proper illustration of the concept of transferred intent. See *Commonwealth* v. *Pitts*, 403 Mass. 665, 669 (1989). Second, Drumgold contends that the judge improperly instructed the jury to consider Taylor's invocation of the Fifth Amendment as substantive evidence in this case. The record belies this argument. There was no such instruction. In fact, the judge instructed the jury that "you are to take no especial consideration of the fact that somebody claimed the Fifth." Third, the defendant argues that there was insufficient evidence to support a joint venture instruction. We have addressed this argument and have found it without merit.

8. *Motion for "mistrial" based on extraneous influence on jury.* Six days after the verdict, an attorney representing alternate juror W, provided the trial judge with W's affidavit containing allegations of jury improprieties. Two weeks later, on November 2, 1989, the defendant filed motions for a "mistrial" and for an opportunity to interview the jurors. The

judge denied those motions. The defendant then petitioned a single justice of this court for extraordinary relief pursuant to G. L. c. 211, § 3. The single justice ordered that there be an evidentiary hearing on the motion for a mistrial. As a result, the trial judge conducted in camera examinations of the jurors and chief court officer at the trial, Z. The judge denied the motion for mistrial and set forth detailed findings and reasoning in a memorandum of decision. The facts we set forth below are taken from the judge's memorandum.

Near the end of the trial but before the judge's final instructions, juror K (ultimately an alternate juror) told juror M (ultimately a deliberating juror) that juror W (ultimately an alternate juror) had said that she wanted a mistrial. Later that evening, juror M told chief court officer Z what Juror K had told her. Z responded to M, "Jesus Christ, I hope to God she [W] is not on the deliberating jury or else this trial will be dragged on and it is already costing the state too much money." In addition to M, the only other juror who heard Z's remark and ultimately deliberated was juror F. F understood the remark to be an expression of Z's ongoing frustration with W and her high dry cleaning bills. A third deliberating juror, S, thought that the remark "sound[ed] familiar," but did not remember Z making it.

After making the quoted remark, Z explained to M that W would be limited to voting guilty or not guilty and that only the judge could order a mistrial. He told M to listen to the judge's instructions. Later that evening, Z told juror S what M had said about W wanting a mistrial.

The judge denied the defendant's motion for a mistrial. The thrust of the defendant's argument on appeal is that, by his statements, chief court officer Z "usurped the Court's authority to communicate with the jury on the record concerning the possibility of the jury not reaching a verdict. . . . [Z]'s inappropriate instruction on the law together with his emotional reaction to the concept that the trial may end up in a mistrial had a coercive effect." The defendant analogizes the "coercive effect" of Z's remarks to the coercion of a deliberating jury sought to be avoided by the jury instruction recommended in *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 101-102 (1973). We disagree.

The defendant bore the burden of showing that the jury were exposed to a significant extraneous influence. *Com-*

monwealth v. *Gilchrist*, 413 Mass. 216, 220-221 (1992). *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). We agree with the judge that the defendant did not meet this burden.

Discussions among the jurors themselves about the option and desirability or undesirability of a mistrial, like other jurors' discussions about the reasons for their decisions, "are not extraneous influences on the jury. Such matters are a part of the internal decision making process of jury deliberations" and they are not available to impeach a verdict. *Id*. at 198-199. See *Commonwealth* v. *Mahoney*, 406 Mass. 843, 855 (1990).

Also, Z's remarks in reaction to being told that juror W was in favor of a mistrial do not qualify as an extraneous disturbing influence. As the judge noted, "There has been no showing that 'specific facts not mentioned at trial *concerning one of the parties or the matter in litigation* were brought to the attention of the deliberating jury by a juror' [emphasis added]. See and compare *Commonwealth* v. *Fidler*, 377 Mass. 192, 200 (1979) (juror inquiry warranted where juror's affidavit alleged that one juror stated during deliberations that the defendant had been shot in Charlestown a month earlier where there was no mention of any occurrence at trial)." As the judge also noted, "The court officer expressed no opinion to any of the jurors about the guilt or innocence or character of the defendant. He did not discuss the merits of the case or the appellate process with any of the jurors. Nor did either of the two deliberating jurors who heard the court officer's statement interpret it as an expression of his belief in the defendant's guilt or innocence." We conclude that, although Z's remarks should not have been made, they were not coercive; they did not constitute an extraneous disturbing influence. The judge rightly denied the defendant's motion for a mistrial.

9. *Motion for a new trial based on ineffective assistance of counsel*. After obtaining new appellate counsel, and while the appeal was pending, the defendant moved in this court for a new trial based on ineffective assistance of trial counsel. We remanded the motion to the Superior Court. Because the trial judge had retired, another judge heard and ruled on the motion. She denied it. On reconsideration, the judge conducted an evidentiary hearing at which trial counsel and the defendant testified. Again, the judge denied the motion. The defendant appealed.

a) Approximately one week after the shooting, the police showed an array of photographs to Tracy Peaks and Mary Alexander. Peaks picked the defendant's photograph from the array and identified him as one of two men who had walked past her house shortly after the shooting. Alexander hesitated when she looked at the defendant's photograph, but was unable to identify him. Nearly one year later, just prior to commencement of the trial, the defendant's trial attorney visited Alexander at her home and showed her a photograph of the defendant. When she was shown the photograph on this occasion, she identified the defendant as the individual that she had seen outside her house carrying a gun moments after the shooting. Trial counsel did not disclose Alexander's identification to the Commonwealth or to the court. The Commonwealth learned of the identification when Alexander mentioned it to Attorney Phyllis Broker, one of the Commonwealth's trial attorneys, only hours before Alexander was scheduled to testify.

To support an ineffective assistance of counsel claim, a defendant must establish a "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). "As to the demonstration of prejudice to the defendant, we have said that 'there ought to be some showing that better work might have accomplished something material for the defense.' *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977)." *Commonwealth* v. *Adams*, 374 Mass. 722, 727 (1978).

A defense strategy, when attacked as ineffective assistance of counsel, must be measured against a consideration of whether " 'some other action would have better protected [the] defendant and was reasonably foreseeable as such before trial'. *Beasley* v. *United States*, 491 F.2d 687, 696 (6th Cir. 1974). The test is not to be made with the advantage of hindsight, and any violation of the attorney's duty must be both substantial and prejudicial. See *United States* v. *Moore*, 554 F.2d 1086, 1089 (D.C. Cir. 1976)." *Commonwealth* v. *Adams*, *supra* at 728-729.

In her memorandum of decision on reconsideration of the motion for a new trial, the judge states:

"The testimony of defendant's trial counsel does not change the court's initial conclusion that his tactical decision to show Alexander the defendant's photograph was not manifestly unreasonable. It was trial counsel's opinion, prior to trial, that the evidence with respect to Alexander's identification of the defendant was 'tenuous.' . . . Defense counsel showed Alexander the photograph because he wanted to know whether she would exculpate or inculpate the defendant. He realized at the time that he was taking a risk but he thought it was important to know how Alexander would testify at trial. If Alexander had failed to identify his client [in the photograph as one of the young men the witness had seen leaving the scene with guns], counsel would have considered that . . . a 'brilliant tactical decision.' "

We agree with the judge. As trial counsel testified at the hearing, he "fully expected [Alexander] to be a witness at trial based upon some identification she had made with regard to [the defendant's] being one of those individuals that she had seen. So [he] expected her to be a witness for the Commonwealth at trial." Based on Alexander's earlier failure to identify his client from an array of photographs shown her by the police shortly after the shooting, there was a reasonable likelihood that Alexander would also have failed to identify him on the single photograph shown to her by counsel at the inception of the trial. Had that occurred, any testimony of Alexander at trial identifying the defendant would have been neutralized or at least substantially weakened. Indeed, had that occurred, the expected identification testimony of Tracy Peaks would have been rendered less credible also. Counsel did not act unreasonably in taking the risk that he took in preference to the risk of inaction on his part.

In addition, the defendant contends that, after Alexander's photographic identification of the defendant as one of the individuals she saw leaving the scene of the shooting and carrying a gun, his trial counsel should have withdrawn from the case because of a conflict of interest. The defendant points out that whenever counsel "learns or it is obvious that he . . . ought to be called as a witness on behalf of his client" he should withdraw. S.J.C. Rule 3:07, Canon 5, DR 5-101, DR

5-102, as appearing in 382 Mass. 780 (1981). *Commonwealth* v. *Rondeau*, 378 Mass. 408, 414-416 (1979). We reject the defendant's argument. His trial counsel had no reason to anticipate that it would be necessary for him to be called "as a witness on behalf of his client." He fully expected Alexander to divulge, as she did, all details concerning the circumstances of his identification procedure. Moreover, defense counsel's testimony was not "necessary to the proper defense" of Drumgold. As the motion judge found, "[c]ounsel's cross-examination of Alexander thoroughly and ably explored the occasions upon which Alexander had made a positive identification and on those occasions when she did not. The circumstances of the identification, the strength of the identification, and all factors bearing on the identification were fully put before the jury." Thus, defense counsel's testimony would have added nothing to the defense.

b) The defendant also challenges trial counsel's decision to have the defendant attend the jury view as ineffective assistance of counsel. He asserts that his counsel's decision was "manifestly unreasonable" because, while at the view, Alexander made a subsequent identification of the defendant. The motion judge concluded that counsel's decision that the defendant should be present at the jury view was reasonable. On appeal, the defendant does not offer any support for his contention that the judge's decision was an abuse of discretion and we are unaware of any. Accordingly, the defendant's claim of ineffective assistance of counsel on this issue must fail. *Commonwealth* v. *Woods*, 382 Mass. 1, 8 (1980).

The defendant makes numerous other claims of ineffective assistance of counsel, several of which are related to counsel's failure to object to the prosecutor's closing argument and the judge's instructions to the jury, matters which have been discussed at length earlier in this opinion. We have reviewed all the defendant's ineffective assistance of counsel claims and conclude that they are without merit.

10. *G. L. c. 278, § 33E, relief.* The defendant asks us to exercise our power under G. L. c. 278, § 33E, to reverse the conviction or reduce the verdict. After thorough review of the law and the evidence, we are persuaded that we should

not exercise our extraordinary power under the statute to reverse the conviction or reduce the verdict.

*Judgment affirmed.*

*Orders denying the motions affirmed.*