COMMONWEALTH *vs.* ERASMO LePORE.

No. 95-P-670.

Suffolk. February 22, 1996. - June 7, 1996.

Present: KASS, KAPLAN, & GREENBERG, JJ.

*Idle and Disorderly Person. Evidence,* Consciousness of guilt, Intent. *Practice, Criminal,* Bill of particulars, Complaint. *Words,* "Disorderly," "Voyeurism."

Discussion concerning disorderly conduct statutes in other States which have included voyeurism within their scope, by express statutory language or by case law, and the application of G. L. c. 272, § 53, the disorderly person statute, to the conduct of a "Peeping Tom," in the absence of an express prohibition concerning voyeurism in the General Laws. [545-548]

At the trial of a complaint alleging that the defendant was a disorderly person in violation of G. L. c. 272, § 53, the evidence warranted a finding that, by his conduct outside two separate ground-floor apartment windows, the defendant was engaged in voyeurism such that a rational trier of fact could have found the essential elements of the crime of being a disorderly person beyond a reasonable doubt. [548-549]

At the trial of a complaint alleging that the defendant was a disorderly person in violation of G. L. c. 272, § 53, the judge did not abuse her discretion in admitting evidence of an earlier incident within minutes of the defendant's arrest at a second location, where an allegation as to place was not essential to describing the crime of being a disorderly person; where the complaint, together with a bill of particulars, enabled the defendant to understand the charge against him; and where the defendant's conduct in the earlier incident was probative of the nature of his conduct and intent at the time of his arrest. [550-551]

COMPLAINT received and sworn to in the Boston Municipal Court Department on August 5, 1994.

On transfer to the jury session of that department, the case was heard by *Patricia E. Bernstein,* J.

*Alfred Paul Farese, Jr.,* for the defendant.

*Kelly A. Downes,* Assistant District Attorney, for the Commonwealth.

K ASS, J. Erasmo LePore was convicted of being a disorderly person (G. L. c. 272, § 53)[1] by a Boston Municipal Court judge, sitting without a jury.[2] On his appeal, he urges that the evidence adduced by the Commonwealth, read generously in its favor, failed to prove the elements of the crime and that his motion for a required finding of not guilty was errone- ously denied. Critically absent from the proof, the defendant maintains, is that anyone saw and was, therefore, disturbed by the conduct identified as disorderly. The defendant also argues error in the admission of certain evidence. We affirm.

On the evidence, the judge could have found as follows. At about 10:00 P.M., August 4, 1994, Christy Hamilton was alone in her apartment when she spotted LePore. That apart- ment, located at the rear of 177 Marlborough Street, Boston, was a ground-floor studio with windows onto a small parking area off the public alley which served the back of the build- ing. The man that Hamilton noticed — who wore black jeans, a dark shirt, and a black baseball cap — seemed to her to ap- proach her windows in an aggressive and threatening manner. She "yelled" at him to get away. He obeyed, and Hamilton promptly called the police. Two Boston police officers, Carl J. Nemes and his partner, Clifford M. Connolly, responded in minutes, obtained a statement and description from Hamil- ton, and set about searching the alley.

Within minutes, the officers found LePore in the alley behind 25 Marlborough Street, in an alcove formed by two garages. LePore was standing near a ground-floor apartment window. The remains of two cigarettes were on the ground in the alley, one still smoldering. The window and screen were open, the interior shade was drawn, and there were iron bars over the window. LePore's clothing and physical appearance matched those described by Hamilton. When questioned, LePore claimed he had gone into the alley to urinate; there was no confirmatory physical evidence.

The young woman occupying this second apartment, Kathy Walsh, was dozing in bed, the television on. Although the window by which LePore stood looked out from the room

[1]LePore was found not guilty of a charge of breaking and entering a dwelling in the nighttime with intent to commit a felony (G. L. c. 266, § 16).

[2]LePore had first opted for a jury trial and then waived his right to trial by jury. See G. L. c. 218, § 26A, as appearing in St. 1992, c. 379, § 139.

where she slept, Walsh was not aware of his presence until she heard, and was startled by, the confrontation between the police officers and LePore. The screen had been shut approximately fifteen minutes earlier when Walsh went to bed; it was not possible for a wind or breeze to have opened it.

The officers took LePore to 177 Marlborough Street, where Hamilton identified him as the individual she had seen earlier.

LePore was arrested and charged with one count each of breaking and entering in the nighttime with the intent to commit a felony, G. L. c. 266, § 16, and disorderly conduct, G. L. c. 272, § 53. The two-count complaint related the place of offense as 25 Marlborough Street. Count one charged LePore "did break and enter . . . the property of Kathy Walsh . . . in violation of G. L. c. 266, § 16." Count two charged LePore "was a disorderly person . . . in violation of the Common Law and G. L. c. 272, § 53."[3] LePore moved for a bill of particulars concerning the breaking and entering charge. The Commonwealth responded, referring to the police report for much of the specific detail.

At trial, Hamilton testified on direct examination to the events which took place at 177 Marlborough Street. LePore's attorney declined to cross-examine Hamilton. Walsh and Officer Nemes testified to the events which occurred at 25 Marlborough Street.

As the text in note 3 shows, § 53, which has long lineage, is a vessel into which the Legislature has tossed a variety of conduct thought sufficiently offensive to society to be declared criminal. The words "with offensive and disorderly acts . . . accost or annoy persons of the opposite sex" are among those that describe the conduct complained of in this case. A person is "disorderly" under G. L. c. 272, § 53, "if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof; he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unrea-

---

[3]Section 53, as appearing in St. 1983, c. 66, § 1, provides as follows: "Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment."

sonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by an act which serves no legitimate purpose of the actor." *Alegata* v. *Commonwealth*, 353 Mass. 287, 304 (1967). *Commonwealth* v. *Feigenbaum*, 404 Mass. 471, 474 (1989). " 'Public' means affecting or likely to affect persons in a place to which the public or a substantial group has access." *Alegata* v. *Commonwealth, supra.*

An equation between voyeurism and disorderly conduct (i.e., being a disorderly person) is not self-evident. Voyeurism, in a dictionary sense and as used in the cases, connotes sexually offensive conduct, the idea apparently being that a man is unlikely to peer through somebody's window to size up the furniture. American Heritage Dictionary 2004 (3d ed. 1992). See *District of Columbia* v. *Jordan*, 232 A.2d 298, 299 (D.C. 1967). Disorderly conduct, as interpreted in *Alegata* v. *Commonwealth*, 353 Mass. at 303-304, "is not primarily, if at all, directed at offensive sexual conduct," but, rather, at intentional conduct that "disturb[s] the public tranquility, or alarm[s] or provoke[s] others." *Commonwealth* v. *Blavackas*, 11 Mass. App. Ct. 746, 749 (1981). To be disorderly, within the sense of the statute, the conduct must disturb through acts other than speech; neither a provocative nor a foul mouth transgresses the statute. See *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 597-598 (1975). Compare *Commonwealth* v. *Richards*, 369 Mass. 443, 447-448 (1976), in which the defendants punched police officers, who were making an arrest, and attracted an unruly crowd.

Disorderly conduct statutes in other states have included voyeurism within their scope, by express statutory language or by case law. Jurisdictions whose disorderly conduct, criminal trespass, or "Peeping Tom"[4] statutes expressly interdict voyeurism include Arizona,[5] California,[6] Georgia,[7] Illinois,[8]

---

[4]The term is an allusion to the Peeping Tom of Coventry, who popped out his head as the naked Lady Godiva passed, and was struck blind for it. Oxford English Dictionary 2113 (Compact ed. 1971). American Heritage Dictionary 1335 (3d ed. 1992).

[5]Arizona's "Peeping Tom" statute, Ariz. Rev. Stat. Ann. § 13-1504A.(2) (1989), proscribes "entering any residential yard and, without lawful authority, looking into the residential structure thereon in reckless disregard of infringing on the inhabitant's right of privacy." Arizona has a sep-

Mississippi,[9] and North Carolina.[10] In most of these statutes, trespass upon the property of the person pried upon is an element of the offense.

The District of Columbia, under a clause in its disorderly conduct statute,[11] includes "[a]cts in such manner as to annoy, disturb, interfere with, obstruct, or be offensive to others." In *Carey* v. *District of Columbia*, 102 A.2d 314, 314-315 (D.C. 1953), and *District of Columbia* v. *Jordan*, 232 A.2d 298, 299 (D.C. 1967), the court decided that peeping in the window of an occupied apartment was disorderly conduct because the offensive nature of the act menaced public order

---

arate statute which proscribes disorderly conduct. Ariz. Rev. Stat. Ann. § 13-2904 (Supp. 1995). See also *State* v. *Serrano*, 145 Ariz. 498 (1985).

[6]Cal. Penal Code § 647(i) (West. Supp. 1996). See also *People* v. *Lopez*, 249 C.A.2d 93, 102-103 (1967).

[7]Ga. Code Ann. § 16-11-61 (1992), makes it "unlawful for any person to be a 'Peeping Tom' on or about the premises of another or to go about or upon the premises of another for the purpose of becoming a 'Peeping Tom.' " See Ga. Code Ann. § 16-11-39 (1992 and Supp. 1995) for Georgia's disorderly conduct statute, and for an illustration of the redefining of disorderly conduct in a State penal code. See also *Banks* v. *State*, 178 Ga. App. 54 (Ga. Ct. App. 1986); *Longenbach* v. *State*, 202 Ga. App. 863 (Ga. Ct. App. 1992).

[8]Ill. Comp. Stat., ch. 720, section 5/26-1(a)(5) (1993). "Enters upon the property of another and for a lewd or unlawful purpose deliberately looks into a dwelling on the property through any window or other opening in it." See also *People* v. *Miller*, 91 Ill. App. 3d 1031 (1980).

[9]Miss. Code Ann. § 97-29-61 (1994), the Mississippi "Peeping Tom" statute makes it unlawful for "[a]ny person who enters upon real property . . . and thereafter pries or peeps through a window or other opening in a dwelling . . . for the lewd, licentious and indecent purpose of spying upon the occupants thereof." Mississippi has a series of statutes which proscribe various activities as disorderly conduct. Miss. Code. Ann. §§ 97-35-3 et seq. (1994). See also *Brown* v. *State*, 140 So. 2d 565 (Miss. 1962), upholding the State's "peeping Tom" statute and likening voyeuristic conduct to disorderly conduct in general.

[10]N.C. Gen. Stat. § 14-202 (1995), the North Carolina "Peeping Tom" statute, threatens a misdemeanor conviction to "[a]ny person who shall peep secretly into any room occupied by a female person." North Carolina has a separate disorderly conduct statute. N.C. Gen. Stat. § 14-288.4 (1995). See also *In re Banks*, 295 N.C. 236 (1978) (upholding the North Carolina "Peeping Tom" statute against overbreadth and vagueness claims).

[11]D.C. Code § 22-1121 (1990); *Carey* v. *District of Columbia*, 102 A.2d 314, 315 (D.C. 1954), *District of Columbia* v. *Jordan*, 232 A.2d 298, 299 (D.C. 1967).

and tranquility.[12] A judge of the Superior Court of New Jersey, on the other hand, decided that a disorderly conduct statute which proscribed engaging "in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously to annoy such other person," N.J. Stat. Ann. § 2C:33-4(c) (1995), did not reach a "Peeping Tom" offense. *State* v. *Zarin*, 220 N.J. Super 99, 101 (1987). In so deciding, the court relied in part upon the removal by the New Jersey legislature from that statute of a provision that had earlier appeared in it and had defined as disorderly conduct "surreptitiously or sneakily invad[ing] the privacy of another by peering into the windows or other openings of dwelling places." *Ibid.* The excision from that statute suggested a legislative intent in New Jersey to decriminalize voyeurism. *State* v. *Fuchs*, 230 N.J. Super 420, 428-430 (1989).

No similar scrubbing of a "Peeping Tom" statute from the books has occurred in Massachusetts, and no express prohibition against voyeurism has appeared elsewhere in the Massachusetts statutes.[13] In the absence of an express prohibition concerning voyeurism in the General Laws, we think G. L. c. 272, § 53, the disorderly person statute, may lawfully be applied to a "Peeping Tom," an activity that may cause alarm to the person peered at, as it did in the instant case, and thereby makes a breach in the public peace.

1. *Sufficiency of the evidence.* The evidentiary record supported findings that LePore's conduct had been threatening (in the assaultive behavior behind 177 Marlborough Street) and to have created a physically offensive condition, by acts behind 25 Marlborough Street which served no legitimate purpose. At both locations, a trier of fact could infer, LePore was engaged in voyeurism.

In the first episode, Hamilton was sufficiently alarmed and

[12]On two occasions, in 1991 and 1995, the Court of Appeals of Wisconsin has applied a disorderly conduct statute, Wisc. Stat. Ann. § 947.01 (1996), that resembles that of Massachusetts, to acts of voyeurism, but the opinions are unpublished and under a local rule, Wisc. Stat. Ann. § 809.23(3) (1996), have no precedential value on substantive issues.

[13]An amendment to G. L. c. 272, § 53, effected by St. 1943, c. 377, removed from the long list in that statute of offenders against the public peace, a variety of characters of whom society felt less scornful than it once did, including "[r]ogues and vagabonds, persons who use any juggling or unlawful games or plays, common pipers and fiddlers." St. 1931, c. 239.

offended so that she called the police. In the second episode — behind 25 Marlborough Street — there was evidence warranting inferences that LePore had tampered with Walsh's screen and had lurked at her window long enough to smoke two cigarettes. LePore's explanation that he had ducked into the public alley to relieve himself could be seen as lame in light of his presence in the same alley a few blocks away several minutes earlier. Indeed, his implausible reason for being outside Walsh's window could be read as evidence of consciousness of guilt. See *Commonwealth* v. *Booker,* 386 Mass. 466, 471 (1982); Liacos, Massachusetts Evidence § 4.2.1, at 120-121 (6th ed. 1994).

Of the episode behind 25 Marlborough Street, LePore argues that the government's case fails because the state of the evidence was that Walsh never knew he was there. Conduct that is disorderly by reason of its physically offensive nature does not, however, require that the object of the offensive conduct be aware of it. *Carey* v. *District of Columbia,* 102 A.2d at 315. Acting the "Peeping Tom" offends and results in disorder by invading the privacy of persons precisely where they are most entitled to feel secure — where they live and rest. The transgression is completed by the violation of privacy just as a trespass may be completed even though the owner of property may not at the time of invasion have known of the presence of the trespasser on her property. LePore's conduct caused public inconvenience or alarm in that it occurred in a public alley. *Alegata* v. *Commonwealth,* 353 Mass. at 304. Although the occupant of 25 Marlborough Street was not conscious of being watched by LePore, the occupant of 177 Marlborough Street was conscious of his presence and alarmed by it. As we shall discuss in the next section, it was proper to consider the two incidents as related, and doing so makes marginal in any event the defendant's argument about the necessity of the object of covert surveillance being aware of it to make voyeurism a crime.

On the basis of the elements of the crime of disorderly conduct as we have discussed them and viewing the evidence in the light most favorable to the Commonwealth, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979). *Commonwealth* v. *Feigenbaum,* 404 Mass. at 474.

2. *Admission of evidence of the incident behind 177 Marlborough Street.* The complaint against LePore cited breaking and entering the property of Kathy Walsh, who lived at 25 Marlborough Street, and, indeed, the complaint listed that address as the place of the offense. The disorderly conduct charge was not tied to Walsh but the place of offense listing could be read as referring to that count in the complaint. Taking the complaint as applying solely to the 25 Marlborough Street episode, LePore argues that it was prejudicial error to receive evidence of the 177 Marlborough Street episode.

We are disinclined, in light of the entire procedural background, to read the complaint as limited to the second incident, at 25 Marlborough Street. An allegation as to place is not essential to describing the crime of disorderly conduct, and the omission of the place or one of the places where the crime occurred is not a defect in the complaint. G. L. c. 277, § 33. *Commonwealth* v. *Parrotta*, 316 Mass. 307, 308-309 (1944). Nor could the defendant claim to have been surprised by the government's offering evidence of the 177 Marlborough Street episode. His request for a bill of particulars concerning the breaking and entering charge elicited the police report tying together the first and second incidents. It was the report by the occupant of 177 Marlborough Street, after all, that led to the discovery of LePore behind 25 Marlborough Street. LePore cannot shut his eyes to what the response to his bill of particulars told him about the disorderly conduct charge because what he had asked for was information about the breaking and entering count. Together, the complaint and bill of particulars enabled the defendant to understand the charge against him and to prepare his defense. See G. L. c. 277, § 34; *Commonwealth* v. *Valleca*, 358 Mass. 242, 244 (1970); *Commonwealth* v. *Donoghue*, 23 Mass. App. Ct. 103, 110 (1986), cert. denied, 481 U.S. 1022 (1987); Smith, Criminal Practice & Procedure § 724 (2d ed. 1983 and Supp. 1996).

Evidence of the 177 Marlborough Street episode was admissible on another ground. LePore's conduct behind 177 Marlborough Street minutes before being confronted behind 25 Marlborough Street was probative of the nature of his conduct and intent at the second location, i.e., whether he was in the alley to urinate or as a voyeur. See *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695 (1979) (evidence of the defendant's

other fencing activities within the same time period as the crime alleged was probative of his knowledge that the goods were stolen); *Commonwealth* v. *Rancourt*, 399 Mass. 269, 275-276 (1987) (evidence that the defendant attempted forcibly to enter a car in which two women were riding shortly before entering the rape victim's car was admissible to prove forcible entry and was relevant to issues of intent and motive); *Commonwealth* v. *Gordon*, 407 Mass. 340, 351 (1990) (evidence of a prior confrontation between the victim and defendant was relevant to the issue of whether the victim reasonably feared the defendant); *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992) (circumstantial evidence may be used to prove a factual proposition and the inference proposed need not be the only one possible); *Commonwealth* v. *Higgenbottom*, 11 Mass. App. Ct. 912, 914-915 (1981) (evidence of a prior aborted robbery was probative of a common scheme or plan); *Commonwealth* v. *Fleury-Ehrhart*, 20 Mass. App. Ct. 429, 430-432 (1985) (at trial on indictment charging indecent assault and battery upon a patient, evidence that the defendant, a doctor, committed similar misconduct against two other female patients was probative of a common scheme, a pattern of conduct, and the absence of accident or mistake). See generally Liacos, Massachusetts Evidence § 4.1.3, at 115-120, § 4.4.8, at 156-167 (6th ed. 1994).[14] The decision to admit Hamilton's testimony was an appropriate exercise of the judge's discretion.

*Judgment affirmed.*

---

[14]Although defense counsel objected to Hamilton's testimony, he did not attempt to impeach her characterization of LePore's conduct at 177 Marlborough Street, i.e., that she was perhaps mistaken or unreasonable in characterizing LePore's approach as aggressive or threatening.