Brassard, J.
Introduction
The defendant, David Swan, (“Swan”) is charged with two counts of Open and Gross Lewdness in violation of G.L.c. 272, §16, and two counts of Disorderly Conduct in violation of G.L.c. 272, §53. He now moves pursuant to Mass.R.Crim.P. 13 to dismiss the indictments under the state and federal constitutions, Commonwealth v. O'Dell, 392 Mass. 445 (1984), and Commonwealth v. McCarthy, 385 Mass. 160 (1982). Specifically, he claims that the Commonwealth presented misstatements of fact and withheld material exculpatory information from the Grand Jury, that there was insufficient evidence to support the indictments, and that the statutes, as applied to him, are unconstitutional. For the reasons that follow, the motion is DENIED.
*375 Background
1. The Indictments
At the time the indictments were returned, Swan had been a custodian in the Lexington public schools for eighteen years, and employed at the Fiske Elementary School for fourteen years. He was one of two custodians at that school. The indictments allege inappropriate behavior towards three school boys occurring between September 1, 2000 and June 30, 2001 in the boys’ bathroom at the Fiske school. For purposes of this decision, the boys shall be referred to as “AA,” “BB” and “CC.”
With respect to AA, the indictments charge Swan with both Open and Gross Lewdness and Disorderly Conduct. Specifically, AA alleges that while he was in the fourth grade, Swan “showed his privates to kids” in the bathroom on more than one occasion. AA alleges that on numerous occasions Swan would stand back from the urinal while urinating with his penis exposed so that AA would see it. Swan would always use the small urinalone designed lower to the ground for shorter children. When he was alone with Swan in the bathroom, Swan’s penis appeared “stiff’ and “straight,” but it appeared “droopy” when other boys were in the bathroom. AA also alleges that while AA was urinating, Swan would approach another urinal and AA could feel Swan staring at him. According to AA, the defendant “look[ed] threatening” and his conduct made AA very uncomfortable and “scared.”
With respect to BB, a fifth grader, the indictments charge Swan with one count of Open and Gross Lewdness. Specifically, BB alleges that Swan would stand next to him at the adjacent urinal exposing himself, and would try to engage BB in conversation. Even when no one else was in the bathroom, Swan would occupy the urinal immediately adjacent to BB and stand far back from the urinal exposing himself to BB. BB found the conduct “weird” and “disgusting.” Even though Swan knew BB’s name, he would always address him in the bathroom as “boy.” According to BB, Swan also made several “crude” comments to him, such as his desire to get a “penis ring,” how it would feel good to pull a tight leotard over his “pecker,” that another student sounded constipated while going to the bathroom, and that he was mad at another student for urinating on the bathroom floor and that he would “beat” him.
With respect to CC, a kindergartener at the time, the indictments charge Swan with Disorderly Conduct. CC alleges that Swan stared at his “privates” while CC was “doing his business.” It made CC “uncomfortable” and he “didn’t really like it” and it made him “feel a little sort of mean, sort of furious,” but CC was “afraid” to tell Swan to stop because he was bigger.
2. The Evidence Presented to the Grand Jury
On August 8, 2002, the Commonwealth presented two witnesses before the Grand Juiy: Ann Beck (“Beck”), a child interviewer from the District Attorney’s office, and Lieutenant Detective Mark Corr (“Lt. Det. Corr”). Three videotaped interviews ofAA, BB and CC were marked as exhibits. The minutes do not reflect whether the Grand Jury actually watched the videotapes. However, they did have a VCR in their deliberating room.
a. Ann Beck
Beck conducted the videotaped interviews of the three complainants. She authenticated each of the videotapes, which were then marked as exhibits, and proceeded to testify as to the contents of each interview. Swan has noted several misrepresentations or misstatements Beck made and asserts that those misstatements materially tainted the integrity of the Grand Jury process. These alleged misrepresentations are as follows.
With regard to AA’s interview:
Beck twice testified that AA said while he and Swan were using urinals, Swan would try to engage AA in conversation. In AA’s taped interview, AA actually states that Swan did not say anything to him at the urinals.
Beck testified that while urinating AA said he could see Swan’s “whole penis” “and eveiything that was there.” AA actually stated only that he could see “most of his penis.”
Beck testified that AA said that Swan would always use the urinal immediately next to him. AA actually said that Swan always used the same urinal at the end of the bathroom.
Beck testified that AA said Swan would watch him urinate in the bathroom and that he “could see, he could sense that Mr. Swan was looking right at him.” She then stated that AA said Swan was looking “at his private parts.” In AA’s interview, when asked where Swan was looking, AA stated: “I don’t really know ‘cuz you . . . I. . . you know how you can feel people staring at you . . . Like I can’t really tell where somebody’s eyes are looking at.”
Finally, Beck testified that AA “repeatedly said that it was disgusting to him how Mr. Swan would tiy to strike up a normal conversation while tiying to go to the bathroom.” AA did not state this in his interview.
With regard to CC’s interview:
Beck inaccurately quoted CC. However, the quote is substantially identical, and contains no serious differences.
Beck stated that CC said that “he knew Mr. Swan’s pants had come down” in the bathroom. CC did not say this. CC stated that while going to the bathroom Swan would use his hand to hold his shirt or his “privates.”
Beck stated that CC said he never asked Swan to stop looking at him because Swan was bigger than *376 him, and “he didn’t know what [Swan] would do.” CC actually said that he was afraid to say anything to Swan “cuz I know he’s bigger than me . . . And I will be sort of afraid to say that." When Beck asked him what he was afraid of, CC responded, “that really . . . really nothing, but I don’t really want to say that ‘cuz he’s really . . . sometimes really nice to me.”
With regard to BB’s interview:
Beck testified that BB said that “no matter where he was in the bathroom, Mr. Swan would come up and use the urinal that was right next to him and that Mr. Swan would undo his pants . . . and that he would pull his penis out to go to the bathroom.” This was not precisely what BB said. BB stated that Swan would use an adjacent urinal even though there were others available
Beck testified that BB said that Swan said “look at this” when he was in the bathroom. This did not occur in the interview.
b. Lt. Det. Mark Corr
Lt. Det. Corr relayed information from a report compiled by a DSS investigator. His testimony was short and consisted largely of reading excerpts from that report. The report was not entered as an exhibit. The Assistant District Attorney elicited primarily exculpatory information from the report, including Swan’s written denial of using a urinal in the boys’ bathroom while a student was present and a similar denial of engaging students in conversation while using a urinal. When Lt. Det. Corr could not remember whether Swan had denied making the statement about ‘leotards,’ the Assistant District Attorney drew his attention to that portion of the report. He then stated: “He denied that he’d ever mentioned to a child about how a leotard might feel on your penis.” The detective testified that Swan had stated he was aware of no policy concerning adults using the children’s bathroom. The Assistant District Attorney did not ask the detective if there was, in fact, such a policy. However, a grand juror asked if there was such a written policy. The detective responded: “My understanding, there was no policy.”
Discussion
1. Impairment of the Integriiy of the Grand Jury
To justify dismissal of an indictment, a defendant must show that “inaccurate or deceptive evidence was given to the grand jury knowingly and in order to obtain an indictment and that the evidence probably influenced the grand jury’s determination.” Commonwealth v. Levesque, 436 Mass. 443, 456 (2002), citing Commonwealth v. Drumgold, 423 Mass. 230, 238 (1996). “It is not enough for dismissal of an indictment that false or deceptive evidence was presented to the grand jury. Two further elements normally must be shown. First, our cases have required a showing that false or deceptive evidence was given to the grand jury knowingly and for the purpose of obtaining an indictment . . . Second, the defendant must show that the presentation of the false or deceptive evidence probably influenced the grand jury’s determination to hand up an indictment. This requires a showing not only that the evidence was material to the question of probable cause but that, on the entire grand jury record, the false or deceptive testimony probably made a difference.” Drumgold, 423 Mass, at 235.
a. Ann Beck
Upon careful review of the videotaped interviews and the transcripts of Beck’s testimony to the Grand Jury, this court agrees that Beck’s testimony did not accurately reflect the three complainants’ interviews. Her errors range from mischaracterizing the testimony, including statements that were not made, and confusing the testimony of the different complainants to less problematic errors, such as confusing irrelevant details of the complainants’ testimony. It is hard to dispute that Beck’s testimony cast the complainants’ testimony in a certain light, and that a reasonable Grand Jury could have come to a different perception of the interviews. The defendant’s argument that Beck’s testimony skewed the prism through which the grand jurors could have viewed the evidence has some force.
The three videotaped interviews were no longer than thirty minutes each, and it was unnecessary for the Commonwealth to elicit Beck’s summary recollection thereof. The Commonwealth should have let the Grand Jury view the interviews for themselves and draw their own conclusions about what each complainant said. That being said, the grand jury did have the videotapes and a VCR to view them with. There is no way of knowing with certainty whether the grand jurors did view those tapes or whether they relied on Beck’s testimony alone. But this may be said with respect to any documentary evidence presented to a grand jury or a petit jury. The courts must assume that jurors do their jobs and review the evidence before them. See Commonwealth v. McCarthy, 385 Mass. 160, 162-64 (1982) (determination of sufficiency of the evidence supporting the indictment is based on the “evidence before” the grand jury). Where the grand jury had the complainants’ videotaped testimony for their deliberations, Beck’s misstatements and mischaracterizations cannot be considered the sole evidence upon which the grand jurors made their determinations.
In any event, even where the evidence presented to the Grand Jury is distorted, to succeed on a motion to dismiss the defendant must still demonstrate that the faulty presentation was done “knowingly and for the purpose of obtaining an indictment.” Drumgold, 423 Mass, at 235. The record is simply devoid of any evidence demonstrating that the Commonwealth’s missteps were intentional or malicious. To the contrary, the Assistant District Attorney used leading *377 questions on several occasions to elicit exculpatory evidence from the witnesses. Several of Beck’s errors were apparently just the result of her confusing testimony of the different complainants. Under these circumstances, Swan has failed to meet his substantial burden. Id. (where testifying officer inaccurately conveyed hearsay to grand jury, dismissal not appropriate because defendant failed to prove the Commonwealth did so knowingly for purpose of obtaining an indictment); Commonwealth v. Jenks, 426 Mass. 582, 587 (1998) (same). See also Commonwealth v. $14,200, 421 Mass. 1, 9 (1995) (indictment maybe based entirely on hearsay); Commonwealth v. St. Pierre, 377 Mass. 650, 655-57 (1979) (presentation of only one witness who, without any personal knowledge, conveyed double hearsay testimony of five percipient witnesses did not require dismissal of indictment); Mass.R.Crim.P. 4(c) (“An indictment shall not be dismissed on the grounds . . . that [ ] hearsay evidence was presented before the grand jury”).
Moreover, in light of the presumption that the grand jurors did view the videotapes, see supra, Beck’s misstatements and mischaracterizations are not likely to have influenced their decision. After viewing the videotapes, the grand juiy would have been able to draw its own conclusions and inferences regarding the complainants’ testimony. This would have rendered any lingering influence of Beck’s inaccurate testimony inconsequential.
Thus, with respect to Beck’s grand jury testimony: (1) while flawed, it was sufficiently cured by giving the grand jurors the videotapes of the interviews; (2) there was no evidence that the flawed testimony was presented knowingly for the purposes of obtaining an indictment; and (3) the testimony was not likely to have influenced the grand jurors’ decision.
b. Lt. Det. Corr
“Prosecutors are not required in every instance to reveal all exculpatoiy evidence to a grand jury.” Commonwealth v. McGahee, 393 Mass. 743, 746 (1985). However, they must disclose evidence that would “greatly undermine the credibility of evidence likely to affect the grand jury’s decision to indict.” Id.
Swan claims that Lt. Det. Corr withheld from the jury that there was in fact no policy concerning adult use of the boys’ bathroom. Lt. Det. Corr testified that it was “my understanding” that there was no such policy in response to a question from a grand juror. This response conveyed sufficiently that there was no policy. Swan also claims that the detective should have been questioned about the Lexington Police Department’s decision not to charge Swan as a result of its own investigation. This information is not probative to the question before the grand jury: whether there is sufficient evidence to constitute probable cause to arrest. The Lexington Police Department’s decision not to charge Swan is not material exculpatoiy information and there was no requirement that this information be revealed to the grand jury. Commonwealth v. Trowbridge, 419 Mass. 750, 753-54 (1995) (Commonwealth not obligated to reveal that two separate investigative bodies had concluded allegations of child rape were unfounded). See also Jenks, 426 Mass, at 587 (Commonwealth not obligated to reveal percipient witness’s opinion that defendant acted in self-defense, where Commonwealth divulged other facts tending to demonstrate self-defense).
2. Sufficiency of Evidence to Support the Indictments[1]
“Generally a court will not inquire into the competency or sufficiency of the evidence before the grand jury.” Commonwealth v. Coonan, 428 Mass. 823, 825 (1999), citing McCarthy, 385 Mass, at 161-62. However, “where a grand juiy receives no evidence of criminality on the part of the accused, the indictment must be dismissed ... ‘At the very least the grand juiy must hear sufficient evidence to establish the identity of the accused ... and probable cause to arrest him.’ ” Commonwealth v. Angiulo, 415 Mass. 502, 510 (1993), quoting McCarthy, 385 Mass, at 163.
The defendant disputes whether the allegations against himnamely, exposing his genitals to children while urinating and peering at children urinating in adjacent urinalsamounts to either open and gross behavior under G.L c. 272, §16 or disorderly conduct under G.L c. 272, §53 respectively.
a. Open and Gross Lewdness: G.L.c. 272, §16
G.L.c. 272, §16 prohibits “open and gross lewdness and lascivious behavior.” To sustain a conviction of open and gross lewdness under G.L.c. 272, §16, “the Commonwealth [is] required to prove five elements: (1) that the defendant exposed his genitals to one or more persons; (2) that the defendant did so intentionally; (3) that the defendant did so ‘openly,’ that is, either he intended public exposure, or he recklessly disregarded a substantial risk of public exposure, to others who might be offended by such conduct; (4) that the defendant’s act was done in such a way as to produce alarm or shock; and (5) that one or more persons were in fact alarmed or shocked by the defendant’s thus exposing himself.” Commonwealth v. Gray, 40 Mass.App.Ct. 901, 901 (1996); Commonwealth v. Quinn, 439 Mass. 492, 496 (2003); Commonwealth v. Fitta, 391 Mass. 394, 398 (1984). There is sufficient evidence of the first two elements, as both BB and AA said they saw Swan’s penis and that Swan exposed himself to urinate. “To be ‘open,’ under G.L.c. 272, §16, the conduct need not occur in a public place, but must occur in the presence of another person who can be alarmed or shocked.” Quinn, 439 Mass, at n.9; Commonwealth v. Wardell, 128 Mass. 52, 53 (1880) (“the conduct of the defendant [exposing himself in a house to two girls] was intentionally open and public, as distinguished from that which is intended to be private, covered and concealed”). Thus, the exposure of Swan’s penis in the bathroom was sufficiently *378 “open” for purposes of the statute. The evidence pertaining to the final two elements requires further discussion.
BB said that Swan would occupy the urinal immediately next to him and stand far back from the urinal while urinating such that BB could (and did) see his penis. BB repeatedly said that this was “weird” and that he was uncomfortable, “like whoa, duck away,” or that he was “thinking hurry up, I got to get out of here” and would then leave as quickly as possible. The alleged conduct must be viewed in context. While this same conduct might not amount to a violation of §16 in an adult male restroom, this situation is different. The conduct described by BB and AA raises the inference that Swan was attempting to expose himself unnecessarily and unreasonably in such a way as to alarm or shock these particularly sensitive (because of their age) victims. There was also sufficient evidence of alarm or shock in that BB said the conduct was “weird” and “disgusting” and that he felt he needed to leave as quickly as possible. Commonwealth v. Guy G., 53 Mass.App.Ct. 271 (2001) (determination that teenage victim was shocked or alarmed when she stated she was “disgusted” proper when “read in the context of the entire encounter”); Commonwealth v. Poillucci, 46 Mass.App.Ct. 300 (1999) (sufficient evidence of alarm or shock where 10-year-old said the defendant was “weird” and he made her nervous and uncomfortable); Commonwealth v. Gray, 40 Mass.App.Ct. 901, 901 (1996) (equating “disgust” with “shock” for purposes of G.L.c. 272, §16). Likewise, AA stated that he was “uncomfortable” when he was in the bathroom with Swan. Id. Therefore, there was sufficient evidence before the Grand Juiy to support the indictments alleging violations of G.L.c. 272, §16.[2]
b. Disorderly Conduct:
“Peering” under G.L.c. 272, §53
“A person is ‘disorderly’ under G.L.c. 272, §53, ‘if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof; he . . . (c) creates a hazardous or physically offensive condition by an act which serves no legitimate purpose of the actor.’ ” Commonwealth v. LePore, 40 Mass.App.Ct. 543, 545-46 (1996), quoting Alegata v. Commonwealth, 353 Mass. 287, 304 (1967). “ ‘Public’ means affecting or likely to affect persons in a place to which the public or a substantial group has access.” Id. at 546; Guy G., 53 Mass.App.Ct. at 274-75. “Disorderly conduct... ‘is not primarily, if at all, directed at offensive sexual conduct,’ ‘but, rather, at intentional conduct that ‘disturb(s) the public tranquility, or alarm[s] or provoke[s] others.’ ” Id. (citations omitted). “To be disorderly, within the sense of the statute, the conduct must disturb through acts other than speech; neither a provocative nor a foul mouth transgresses the statute.” Id.
In LePore, the Appeals Court held that the “Peeping Tom” falls within the rubric of disorderly conduct, because it is “an activity that may cause alarm to the person peered at. . . and thereby makes a breach in the public peace.” 40 Mass.App.Ct. at 548. The breach of the peace arises from the unjustified invasion into a socially recognized zone of privacy. Id. As with Section 16, context is critical. While peering at other men in a men’s public restroom might not create a “physically offensive condition," or constitute an intrusion into a socially recognized zone of privacy, the same is not so in the context of the staring which allegedly occurred in this case. Here, each young complainant was alone in the bathroom with Swan, a grown adult man, when Swan allegedly stared at the complainant as the complainant urinated. This conduct constitutes “a breach in the public peace,” because children should reasonably expect a certain degree of privacy when they are urinating in an elementary school bathroom that, when respected, would protect them from peering adults.[3] Therefore, there was sufficient evidence before the grand jury to support the indictments alleging violations of G.L.c. 272, §53.
3. Notice/Vagueness
Swan argues that if “peering” and exposing himself while urinating under the circumstances alleged in the indictments constitute crimes, that he was not sufficiently apprised thereof, such that attaching criminal liability would violate his rights under the state and federal constitutions. Specifically, he argues, if his conduct is prohibited, then “every man would also need to be sure that as they walked into the area of a bank of urinals, they close their eyes and keep them closed.” As the argument goes, there is no sufficiently clear line distinguishing lawful from unlawful bathroom etiquette.
I am unpersuaded by the defendant’s argument. “An essential principle of due process is that a statute may not proscribe conduct ‘in terms so vague that [persons] of common intelligence must necessarily guess at its meaning.’ A vague statute offends due process because of ‘its lack of reasonably clear guidelines for law enforcement and its consequent encouragement of arbitrary and erratic arrests and prosecutions.’ A statute, the terms of which do not themselves provide clear guidelines, may nonetheless be sufficiently definite because of ‘judicial construction, common law meaning, or the statutory history of particular terms, and such a statute may be rendered ‘constitutionally definite by giving it a reasonable construction.’ ” Quinn, 439 Mass, at 499-500 (internal citations omitted).
With respect to the §53 indictments, that statute has long prohibited the intentional creation of a physically offensive condition by an act that serves no legitimate purpose. As noted above, the context is critical to the indictments in this casethis was not just any bank of urinals in a public restroom where a man catches a glimpse of another man urinating. Here, the *379 alleged Intentional conduct could serve no conceivable legitimate purpose and created an offensive, uncomfortable situation for the young complainants. There is a patent and obvious legal distinction under §53 between a grown adult male persistently staring at a young boy or his genitals as the boy urinates and an adult male’s unavoidable fugacious observations in a men’s bathroom. See LePore, 40 Mass. App Ct. at 547-49. Although the line between lawful and unlawful conduct under §53 may not always be clear,[4] the alleged conduct in this case does not fall near that line. Accordingly, as applied to Swan’s alleged conduct, Section 53 is not unconstitutionally vague. See Commonwealth v. Whiting, 58 Mass.App.Ct. 918, 919-20 (2003).
With respect to the Section 16 indictments, intentional and unnecessary exposure of the genitals to children in such a manner as to shock or alarm has long been considered unlawful under that statute. Quinn, 439 Mass, at 501 (“The requirement that the defendant must [expose himself so] as actually to alarm or shock another has remained unchanged since 1880”); Fitta, 391 Mass, at 396 (“Thus, if the Commonwealth were to prove beyond a reasonable doubt that the defendant ‘intentionally, indecently, and offensively expos[ed] himself ... to [a child] of tender years, without necessity or reasonable excuse, and in such a way as to produce alarm . . . [the defendant would be] guilty of gross lewdness and lascivious behavior’ ”). See Commonwealth u. Wardell, 128 Mass. 52, 53 (1880). The defendant would have a point if the evidence demonstrated only that the exposure was unintentional or done with the innocent purpose of urinating. However, that is not the allegation in this case. There is no constitutional infirmity. See Whiting, 58 Mass.App.Ct. at 919-20.
Order
For the foregoing reasons, the defendant’s motion to dismiss is DENIED.

In light of the above discussion, in analyzing the sufficiency of the evidence before the grand jury, the court will rely on the complainants’ interview testimony from the videotapes, and not Beck’s grand jury testimony.

he complainants’ failure to tell another adult about Swan’s alleged conduct until several months later is not determinative of “shock or alarm.” Guy G., 53 Mass.App.Ct. at 274.

Swan argues that there is insufficient evidence of shock or alarm. However, “[c]onduct that is disorderly by reason of its physically offensive nature does not. . . require that the object of the offensive conduct be aware of it.” LePore, 40 Mass.App.Ct. at 548. “Acting the "Peeping Tom" offends and results in disorder by invading the privacy of persons precisely where they are most entitled to feel secure . . ." Id.

The Massachusetts appellate courts have noted that the statute, on its face, is antiquated and vague. Commonwealth v. Chou, 433 Mass. 229, n.2 (2001) (“G.L.c. 272, §53, has been saved, although sometimes just barely, by several limiting constructions and we have repeatedly commented that the statute is archaic and in need of legislative scrutiny”). See Commonwealth v. Sefranka, 382 Mass. 108, 111-13 (1980) (discussing history of statute and various challenges thereto).