### COMMONWEALTH *vs.* DAVID SWAN.

No. 07-P-503.

Middlesex. March 10, 2008. - December 4, 2008.

Present: McHugh, Brown, & Katzmann, JJ.

*Indecent Exposure. Open and Gross Lewdness and Lascivious Behavior. Idle and Disorderly Person.*

Evidence at a criminal trial, which established that the defendant openly exposed himself in a school lavatory in a manner so as to shock or alarm, and that the child victim was in fact shocked, was sufficient to convict the defendant of open and gross lewdness under G. L. c. 272, § 16 [260-261]; further, the evidence, viewed in the light most favorable to the Commonwealth, warranted a conclusion that the defendant intentionally indecently exposed himself to a second victim in violation of G. L. c. 272, § 53 [261-262].

Evidence at a criminal trial was insufficient to sustain a criminal defendant's conviction of disorderly conduct under a voyeurism theory, in violation of G. L. c. 272, § 53, where the defendant's actions occurred in a location (an open urinal area in a school lavatory) that was insufficiently private to trigger the prohibitions embodied under that theory. [262-265]

INDICTMENTS found and returned in the Superior Court Department on August 8, 2002.

The cases were heard by *Catherine A. White*, J.

*Kevin S. Nixon* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

McHugh, J. After a jury-waived trial before a Superior Court judge, the defendant was convicted of indecent exposure, G. L. c. 272, § 53; open and gross lewdness, G. L. c. 272, § 16; and disorderly conduct under a voyeurism ("Peeping Tom") theory, G. L. c. 272, § 53. On appeal, he claims that his motion for a required finding of not guilty as to all counts should have been allowed because the evidence was insufficient to support the convictions. We conclude that the evidence was sufficient to

sustain the convictions of indecent exposure and open and gross lewdness but was insufficient to sustain the conviction of disorderly conduct. Therefore, we reverse that judgment but affirm the other two.

*Background.* As is required in cases where a defendant challenges the sufficiency of the evidence, we review the record in the light most favorable to the Commonwealth. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). A reasonable fact finder could have found the following facts.

The defendant was a janitor at the Fiske Elementary School (Fiske) in Lexington when the two complaining witnesses, Nathan and Joshua,[1] were students. Fiske had two wings, one for children in kindergarten and first grade and the other for older students. Each wing had a lavatory marked "Boys" and there were two lavatories in the main hallway marked "Men" and "Women."[2] No policy prohibited teachers and staff from using the children's lavatories.

Nathan, who was in high school at the time of trial, had attended Fiske from first grade through fourth grade and knew the defendant from his time at Fiske. When Nathan was in the fourth grade he would see the defendant in the boys' lavatory six or seven times per week. The boys' lavatory had five urinals in a row, all without doors, and three stalls with doors. One of the urinals was designed for shorter boys and was much closer to the floor than the other four.

Nathan observed that the defendant always used the shortest of the five urinals. When other children were in the lavatory, the defendant would stand very close to the urinal. However, when Nathan and the defendant were alone in the lavatory, the defendant would stand far away from the urinal, exposing his penis, which was sometimes erect. The defendant would also stare at Nathan while Nathan used the urinal, making him feel embarrassed and threatened.

Joshua attended Fiske from kindergarten through the fifth grade and was in the fourth or fifth grade when he became aware of the defendant's regular use of the boys' lavatory. Joshua

---

[1]Both names are pseudonyms.

[2]Adults and staff could also use lavatories in the principal's office, nurse's office, faculty lounge, and staff office.

always used the urinal at the far end of the lavatory and the defendant would always use the adjacent urinal, although others were unoccupied. The defendant would make "small talk" with Joshua and stand back far enough so that Joshua could see his penis. The defendant's actions made Joshua feel "grossed out" and "nervous." On one occasion, the defendant told Joshua that he would like to get a "penis ring." Another time when Joshua's sister was in a dance recital at Fiske, the defendant commented, "[I]imagine how that would feel pulling [tights] up over your pecker." The defendant's comments made Joshua feel angry, upset, and anxious.

Reports of the defendant's activities made their way to authorities, and in subsequent investigations conducted by the school, the Department of Social Services,[3] and the District Attorney's office, the defendant denied acting inappropriately with any student at Fiske. At trial, the defendant's attorney argued that no crimes occurred in the boys' lavatory and that using a urinal inevitably required the defendant to expose his penis. The defendant also emphasized that there was no policy prohibiting an adult from using the children's lavatories and that neither Nathan nor Joshua had alerted any adult immediately after the incidents.

The trial judge allowed the defendant's motion for a required finding of not guilty with respect to the indictment charging him with open and gross lewdness in the presence of Nathan, but considered the lesser included offense of indecent exposure. The judge found the defendant guilty of indecent exposure and of disorderly conduct under a voyeurism theory with respect to the defendant's actions toward Nathan. The judge also found the defendant guilty of open and gross lewdness with respect to Joshua. The defendant appeals the judge's denial of his motion for a required finding of not guilty on all charges.

*Open and gross lewdness.* "Open and gross lewdness and lascivious behavior" is prohibited by G. L. c. 272, § 16, but the statute does not define the offense. However, decisional law requires proof of five elements to support a conviction, i.e., that the defendant (1) exposed genitals, breasts, or buttocks;

---

[3]Now known as the Department of Children and Families.

(2) intentionally; (3) openly or with reckless disregard of public exposure; (4) in a manner so "as to produce alarm or shock"; (5) thereby actually shocking or alarming one or more persons. *Commonwealth* v. *Kessler*, 442 Mass. 770, 773 & n.4 (2004).

The defendant contends that the Commonwealth's evidence at trial did not establish that the defendant openly exposed himself in a manner so as to produce shock or alarm, or that the victim was in fact shocked. We disagree.

Our review of the evidence persuades us that the trial judge, as fact finder, was warranted in the conclusion that the defendant intended to expose himself beyond the degree necessary for urination. See *Commonwealth* v. *Quinn*, 439 Mass. 492, 494-499 (2003). The defendant always used the urinal next to the one Joshua was using, even when more distant urinals were available, and stood far enough away from the urinal for Joshua to see his penis. The defendant also engaged in small talk, apparently encouraging Joshua to pay attention to him. From those acts and Joshua's age, the judge could reasonably find an intent to produce shock or alarm. See *Commonwealth* v. *Kessler*, 442 Mass. at 777 (a child's tender years may be considered in determining intent to produce alarm or shock because "there is arguably a greater risk of harm due to the child's immaturity . . ."). In determining intent, the judge could also draw inferences from the two sexually explicit comments the defendant made to Joshua. See *Commonwealth* v. *Rivera*, 425 Mass. 633, 648-649 (1997). Finally, Joshua's testimony that he was "grossed out" and made "nervous" by the defendant's behavior, so much so that he rushed to leave the lavatory, establishes that he was alarmed as required by the statute. Contrast *Commonwealth* v. *Kessler*, 442 Mass. at 774 (testimony that the victim was "nervous" and "offended" but continued observing the defendant's lewd behavior did not demonstrate that the victim was actually alarmed or shocked).

*Indecent exposure.* Indecent exposure requires "an intentional act of lewd exposure, offensive to one or more persons." *Commonwealth* v. *Broadland*, 315 Mass. 20, 21-22 (1943), quoting from *Commonwealth* v. *Bishop*, 296 Mass. 459, 462 (1937). Viewed in the light most favorable to the Commonwealth, the judge was warranted in concluding that the Commonwealth had

proved its case. The judge could reasonably conclude that the defendant lewdly exposed himself to Nathan by using the urinal designed for shorter boys when higher urinals were available and by standing farther away from the urinal than was necessary to urinate. Testimony that the defendant had an erection while standing at the urinal further supports the judge's finding. See *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980) ("inferences drawn . . . need only be reasonable and possible and need not be necessary or inescapable").

Nathan's testimony that the defendant stood close to the urinal when other children were in the lavatory but stood farther away from the urinal when he and the defendant were alone permitted a rational trier of fact to infer the defendant's intent to expose himself. See *Commonwealth* v. *Rivera*, 425 Mass. at 648-649, quoting from *Commonwealth* v. *Ellis*, 356 Mass. 574, 578-579 (1970) (intent can be inferred "from all the facts and circumstances developed at the trial"). The defendant's sexually explicit comments to Joshua also support that inference. See, e.g., *Commonwealth* v. *King*, 387 Mass. 464, 471-472 (1982) (the defendant's conduct with one person if sufficiently related in time and location to his conduct with a second person can be probative of intent with which the defendant acted during the latter conduct).

Finally, Nathan's testimony that he felt embarrassed and threatened by the defendant's actions permits the conclusion that the defendant's actions "offended" him, thereby supplying the last element necessary for conviction. See *Commonwealth* v. *Cahill*, 446 Mass. 778, 781 (2006), quoting from Black's Law Dictionary 1113 (8th ed. 2004) ("[o]ffensive acts are those that cause 'displeasure, anger or resentment; esp., repugnant to the prevailing sense of what is decent or moral' ").

*Disorderly conduct.* As noted, the Commonwealth prosecuted the disorderly conduct charge under a voyeurism or "Peeping Tom" theory. The disorderly conduct statute, G. L. c. 272, § 53,[4]

---

[4]In full, G. L. c. 272, § 53, amended by St. 1983, c. 66, § 1, provides:

"Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd,

does not explicitly address voyeurism but, as construed in a series of decisions, does provide that a person is "disorderly"

> "if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: . . . (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."

*Alegata* v. *Commonwealth*, 353 Mass. 287, 304 (1967), quoting from Model Penal Code § 250.2 (Proposed Official Draft 1962). The "public" element of the offense is satisfied if the defendant's action affects or is "likely to affect persons in a place to which the public or a substantial group has access." *Ibid.*

Despite the absence of an explicit textual reference to voyeurism in § 53, we concluded in *Commonwealth* v. *LePore*, 40 Mass. App. Ct. 543, 548 (1996), that the statute "may lawfully be applied to a 'Peeping Tom,' an activity that may cause alarm to the person peered at . . . and thereby makes a breach in the public peace." In reaching that conclusion, however, we implicitly noted the concept's limitations.

First, the conviction in *LePore* was based on conduct the Peeping Tom concept readily brings to mind. A woman was startled when she saw the defendant aggressively approach the rear window of her first-floor apartment, which she occupied alone. She yelled at him to leave and he did. Nevertheless, her alarm was such that she immediately called the police. They responded promptly and discovered the defendant standing outside the rear window of another young woman's apartment under circumstances clearly indicating that he had been peering into the window to watch her while she slept. *Id.* at 544-545.

Second, in explaining the Peeping Tom concept of disorderly conduct, we cited statutes in six other States that expressly prohibited the conduct and two cases in which the District of

wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment."

Columbia Court of Appeals concluded that "Peeping Tom" behavior was included in the District's disorderly conduct statute.[5] *Id.* at 546-548 & nn.5-11. Each of the statutes prohibited peeping into houses or occupied rooms,[6] most involved a trespass on real property, and the District of Columbia cases, *Carey* v. *District of Columbia*, 102 A.2d 314 (D.C. 1954), and *District of Columbia* v. *Jordan*, 232 A.2d 298 (D.C. 1967), involved the same kind of conduct.

Third, in explaining why Peeping Tom activities are among those our disorderly conduct statute prohibits, we said: "Acting the 'Peeping Tom' offends and results in disorder by invading the privacy of persons precisely where they are most entitled to feel secure — where they live and rest." *Commonwealth* v. *LePore*, 40 Mass. App. Ct. at 549.

It may be that the "Peeping Tom" or voyeurism theory of disorderly conduct prohibited by § 53 is not limited to surreptitious peering into occupied residential rooms, although the Commonwealth cites no case or statute that extends the theory to a broader range of activity, and we are aware of none. But even if the concept is broader, cf., e.g., *Commonwealth* v. *Wright*, 61 Mass. App. Ct. 790, 791-792 (2004), we think that at its core, the concept is designed to protect the legitimate and widely shared expectations of privacy possessed by those who have purposely closed themselves off from public view in an enclosed space or area.

The portion of the lavatory containing the urinals described in this case is not such an area. The fact that five urinals stood side by side, the fact that anyone could walk through the lavatory door at any moment and observe those standing at one or more of the urinals, and the fact that anyone using the lavatory could immediately see its open character, all combine to remove any expectation of privacy that a person might have when using the urinals in that lavatory. That is not to say that the defendant's staring activity was proper or appropriate. Of course, it was not.

[5]D.C. Code § 22-1121 (1990).

[6]Ariz. Rev. Stat. Ann. § 13-1504(A)(2) (1989); Cal. Penal Code § 647(i) (West. Supp. 1996); Ga. Code Ann. § 16-11-61 (1992); Ill. Comp. Stat., ch. 720, § 5/26-1(a)(5) (1993); Miss. Code Ann. § 97-29-61 (1994); N.C. Gen. Stat. § 14-202 (1995).

It is to say, though, that the activity occurred in an area that was insufficiently private to trigger the prohibitions embodied in the Peeping Tom or voyeurism theory of disorderly conduct.

The defendant's conviction for disorderly conduct is vacated and the case is remanded to the Superior Court for entry of a judgment of not guilty. In all other respects, the convictions are affirmed.

*So ordered.*